591 P.2d 1160

**STATE of New Mexico, Plaintiff-Appellee,**

v.

**Charles B. DAVIS, Defendant-Appellant.**

**No. 3694.**

Court of Appeals of New Mexico.

Feb. 1, 1979.

Melanie S. Kenton, Santa Fe, for defendant-appellant.

Jeff Bingaman, Atty. Gen., Michael E. Sanchez, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

WOOD, Chief Judge.

Defendant was convicted of kidnapping, extortion, aggravated battery, and aggravated assault. He was acquitted of assault with intent to commit a violent felony (murder). We discuss the issues that were briefed; issues listed in the docketing statement, but not briefed, are deemed abandoned. *State v. Ortiz*, 90 N.M. 319, 563 P.2d 113 (Ct.App.1977). The issues briefed group into four topics: (1) the hostage as-

pect of kidnapping; (2) the propriety of evidence as to the injury of one of the victims; (3) discovery of and limitations on the use of a witness's statement; and (4) discovery of a grand jury transcript.

Tessier (Rolland Tessier) was a sign manufacturer; the name of the business was Tesco Signs, Inc. Defendant was employed by the firm as a janitor and truck driver. Scott had been employed by the firm, but had been fired the week before the crimes. Judy married Tessier subsequent to the events in question. At the time of the crimes she was Judy Higginbotham. Kristin Higginbotham was the daughter of Judy. Jennifer Boyd was Kristin's friend. Kristin and Jennifer were six years old. Rhea Taylor was an acquaintance of Judy. Willis (Robert Willis) was an acquaintance of Rhea.

On May 26, 1977, defendant had been instructed to deliver a coffee table to Tessier's residence. Tessier was at home preparing to hang a picture. Tessier went to get a hammer from his workshop; he saw the coffee table on the patio, the Tesco truck in the alley, and defendant loading trash on the truck. He also saw defendant's car pull into the alley, driven by Scott. He saw Scott and defendant having a conversation. Having obtained the hammer, Tessier started back to the house. Before reaching the house, Scott came up to Tessier and sought, unsuccessfully, to get his job back.

After reentering the house, there was a banging on the back door. Scott was at the back door. Scott again inquired as to getting his job back. When Tessier stated that there was no way Scott would be reemployed, Scott pulled out a pistol, cocked it, pointed it at Tessier's head, and told Tessier to put his hands on his head and back into the dining room. Scott told Tessier to call Judy; Tessier complied. Scott then told Tessier to call defendant; Tessier complied.

Upon defendant's entry, Scott inquired about Tessier's shotgun; defendant fetched it from a bedroom. Defendant handed the shotgun to Scott; Scott passed the pistol to defendant who held it on Judy. Up to this point, Scott had twice threatened to kill Tessier and once had threatened to kill Judy.

Scott demanded, and obtained, Tessier's cash—$200. Scott then demanded a check for $5,000. When told there was not that much money in the bank, Scott had Tessier write a check to Scott for $3,000. Scott then told Tessier to tear up the check and write a check to defendant for $3,000. Defendant left to cash the check. While defendant was gone, Scott rambled on "about honkeys and whities, how the black man didn't have a chance" and "repeated several times that he [Scott] wished I [Tessier] would do something so he could waste me away and blow me away because of something I had done to a friend of his." Defendant returned in about twenty minutes, having unsuccessfully attempted to cash the check at two banks. About this time, Kristin and Jennifer returned from purchasing snow cones; they were kept with Tessier and Judy.

Scott wanted Tessier to write another check; Tessier had no more checks at the house. Defendant suggested Tessier call his business and authorize defendant to pick up Tessier's checkbook. Tessier made the telephone call; defendant went after the checkbook. While defendant was on this errand, Scott went on and on about the terrible things Tessier had done to Scott's friend, Arthur Lacey, "and that he was going to waste me for what I had done."

Defendant returned with the checkbook; Scott and defendant wiped the checkbook for fingerprints. After Tessier balanced his checkbook, the balance in the checking account was $1,587. Scott and defendant conferred; Tessier was told to write a check for $1,500 to defendant. Defendant left to cash the check and returned with the money.

After Scott and defendant conferred, Scott told Tessier that everyone would depart in two vehicles. Defendant would take Judy, Kristin and Jennifer in the truck. Tessier would go with Scott in the car. Scott said "that if I [Tessier] tried to overpower him or tried to get away, Charles [defendant] will kill them [the three fe-

males], and if you try to escape, I will kill you."

Before leaving defendant obtained a pistol from Tessier's car. The group left, divided as previously indicated. Defendant and the three females were in defendant's car; Scott and Tessier in Tessier's car. Scott was holding a cocked pistol on Tessier and again threatened to kill Tessier for "'what you did to Arthur Lacey'". While driving, defendant's car had a flat tire. The group returned to the house; defendant and the females transferred to the truck. After some driving in Roswell, the group went to the Bottomless Lakes, eventually stopping in a cul-de-sac at Figure Eight Lake "where they got us out of the car and the truck."

The group went "behind the face of the hill"; Scott and defendant conferred; Tessier and the three females were directed to a flat area so that Scott and defendant were "ten to twelve feet above us, so they were looking down at us." Scott and defendant then "had quite a long discussion" and started to move closer to the females. Defendant pointed his pistol at Tessier and told him to get away from Judy.

Thereafter both Scott and defendant took turns driving to an adjacent lake to check if people were around. Scott made two trips, defendant made four. During one of Scott's trips, Tessier "tried to reason" with defendant, unsuccessfully. Defendant told Tessier he was going to waste him because Tessier treated defendant like a slave, was a racist "'and besides that, you burned my blood brother Arthur Lacey.'" The context of this conversation, according to Tessier's testimony, is that Tessier turned Lacey "'into the police'" after Lacey threatened Tessier's life.

After the trips to the adjacent lake, Scott said, "'we can't kill them here because there are too many people around, so let's go back to the car.'" When the group returned to the car, another vehicle drove up. The occupants were Rhea and Willis. When they came up to the group, the guns were pointed at them also. Scott said, "'we are going to have to waste all of

you.'" When told to "go back up the hill", Tessier refused. Scott said he would kill Judy if Tessier did not get up the hill. Tessier complied.

The group was then backed up to the edge of the lake. Scott and defendant raised their guns, Tessier heard a shot, felt a bullet go by his head, slipped back and fell into the lake. As he fell he heard more shots. Rhea and Willis had been shot. After the shooting, Scott and defendant drove back to Roswell in the Tesco truck. Scott killed himself before being apprehended by the police.

*The Hostage Aspect of Kidnapping*

Section 30–4–1, N.M.S.A.1978 states:

A. Kidnaping is the unlawful taking, restraining or confining of a person, by force or deception, with intent that the victim:

\*      \*      \*      \*      \*      \*

(2) as a hostage, confined against his will  .   .   . .

Under this provision, the unlawful taking, restraining or confining must be with the intent that the victim "be held as security for the performance, or forbearance, of some act by a third person." *State v. Crump*, 82 N.M. 487, 484 P.2d 329 (1971).

■ The criminal information charged that each of the six victims—Tessier, Judy, Kristin, Jennifer, Rhea and Willis—were held as hostages. Thus, defendant was put on notice that the State charged the one offense of kidnapping was committed by holding any one of the victims as a hostage, and that defendant should be prepared to defend the charge in connection with each of the victims. *State v. Gurule*, 90 N.M. 87, 559 P.2d 1214 (Ct.App.1977).

■ The jury was not instructed on kidnapping as to each of the victims. The kidnapping instruction limited the hostages to Judy, Kristin and Jennifer. This was no change in the charge; rather, it was a limitation on the way in which the kidnapping offense was committed. Restricting the means by which the offense was com-

mitted to three of the victims named in the information was not prejudicial to defendant. Compare *State v. Armijo*, 90 N.M. 614, 566 P.2d 1152 (Ct.App.1977).

The jury was also instructed that Judy, Kristin and Jennifer must have been held as hostages for the performance or forbearance of some act by Tessier.

■ Because Tessier was named as a hostage in the information, but not as a third party, defendant asserts it was improper for Tessier to be considered the third party in connection with Judy, Kristin and Jennifer. Defendant contends the use of Tessier as a third party denied the defendant "his right to know exactly what he is being charged with and to be tried solely on those charges". This contention is without merit.

We have previously pointed out that defendant was charged with kidnapping by holding any one of six victims as a hostage, and that kidnapping was submitted to the jury on the basis of three of the victims named in the information. Defendant had notice of the charge and was tried on the charges in the information.

The information did not state the third person for whom any of the six victims were held hostage, and it is not contended that the information was required to do so. See Rule of Crim.Proc. 8(a)(3). We note that defendant did not ask for information about the third person; he requested no statement of facts. See Rule of Crim.Proc. 9.

■ The issue, simply, is whether Tessier could be the third person involved in Judy, Kristin and Jennifer being held as hostages. *State v. Crump*, supra, makes it clear that the victim and the third person cannot be the same individual; thus, Tessier could not have been a hostage for the performance of some act by Tessier. However, *Crump*, supra, does not hold that Judy, Kristin and Jennifer could not be hostages for the performance of some act by Tessier. If it is charged that X and Y were held as hostages, this does not prohibit a conviction of kidnapping on the basis that X was hostage for the performance of some act by Y, and vice versa.

■ We need not consider whether there was evidence that Tessier was held as a hostage for the performance of an act by a third party because no issue as to Tessier, as a hostage, was submitted to the jury. The kidnapping instruction referred to Tessier only as a third party, not as a hostage. The instruction was not erroneous under the evidence, and was consistent with the charge in the information.

■ Concerning the sufficiency of the evidence, defendant states "there was no evidence of a third party for whose act or forbearance the hostages were held." The claim is frivolous. The threats to kill Judy at the house were for the purpose of requiring action by Tessier. The threat that defendant would kill Judy, Kristin and Jennifer, if on the trip to the Bottomless Lakes Tessier attempted to escape or overpower Scott, met the requirements of *State v. Crump*, supra. There is also evidence of a threat to kill Judy, while at the lake, if Tessier did not move as commanded. This evidence also met the *Crump* requirement.

*Evidence of Injury of One of the Victims*

■ The aggravated battery conviction is based on the shooting of Willis which resulted in great bodily harm. Section 30–3–5, N.M.S.A.1978. The aggravated assault charge was submitted on the basis of pointing a gun at Tessier, or Judy, or Kristin, or Jennifer, or Rhea, or Willis. Section 30–3–2, N.M.S.A.1978. Great bodily harm was not an element of the aggravated assault charge.

During direct examination, Rhea testified that she had been shot twice and hospitalized as a result of being shot. Over defendant's objection, Rhea testified as to her personal injuries, that one of the bullets went through her pelvic area, and she understood there might be damage to her reproductive organs.

Defendant had objected to this testimony as immaterial. Upon renewing this objection, the trial court agreed that the extent of Rhea's injuries had no probative value on

the aggravated assault charge. It would seem, as the prosecutor contended, that the extent of Rhea's injuries was relevant to the charge that defendant assaulted Rhea with the intent to commit murder. The trial court did not rule on this contention, and we do not consider it further.

After the trial court agreed with defendant that the extent of Rhea's injuries was not relevant to the aggravated assault charge, defendant requested the trial court to instruct the jury on the matter. The trial court did so; the jury was instructed to disregard Rhea's testimony concerning the extent of her injuries.

After the trial court instructed the jury, the State called seven more witnesses and rested its case-in-chief. Defendant then moved for a mistrial on the basis of the testimony concerning the extent of Rhea's injuries. Defendant contends the denial of this motion was error. We disagree for two reasons.

■ First, the motion was not timely. *State v. Milton*, 86 N.M. 639, 526 P.2d 436 (Ct.App.1974); compare *State v. Baca*, 89 N.M. 204, 549 P.2d 282 (1976).

■ Second, the evidence of the aggravated assault was overwhelming; defendant could not have been prejudiced by the testimony as to the extent of Rhea's injuries after the jury was told to disregard that testimony. *State v. Sanchez*, 87 N.M. 140, 530 P.2d 404 (Ct.App.1974); *State v. Thurman*, 84 N.M. 5, 498 P.2d 697 (Ct.App. 1972).

*Discovery of and Limitations on Use of a Statement*

Arthur Lacey was arrested in Colorado on at least one New Mexico charge and possibly four felony warrants issued in Texas. He was returned to New Mexico and jailed. We have no information as to when Lacey was returned to New Mexico. On August 30, 1977, Lacey responded to questions of two sheriff's department officers for more than two hours. The questions and answers, not under oath, were recorded. Subsequently a transcript of the recording was prepared; the typed transcript consists of 205 pages. This transcript of the officers' questions and Lacey's answers is the statement involved in this issue.

■ Defendant presents five contentions which involve Lacey's statement. A consideration applicable to each of the five claims is the irrelevancy of the statement to issues in this case. Lacey stated that he knew nothing about the criminal events of May 26, 1977; he first heard about them two or three days after they happened. As to the defense that defendant had no criminal intent in connection with his part in the crimes, Lacey stated that he had not been acquainted with defendant, "I never even knowed him". Lacey's knowledge about the crimes or defendant's participation was hearsay information acquired from others. Lacey had no personal knowledge. Evidence Rule 602.

(a) At a pretrial hearing on October 11, 1977, defendant requested that he be furnished a report which, upon information and belief, was in the possession of the sheriff's office. The prosecutor reported that he did not know of any such report, but if the report did exist, the report would be furnished to the defendant. At the time of this representation by the prosecutor, one of the officers who questioned Lacey was in the courtroom, but kept silent.

The transcript indicates that, at the time of defendant's request, the statement was in the possession of federal officers. Upon the statement being returned to the sheriff's office, it was turned over to the prosecutor, who promptly notified defense counsel as to its existence. The prosecutor, however, refused to furnish a copy of the statement to the defense. Instead, the prosecutor filed a motion asking the trial court to determine whether the contents of the statement should be made available to the defense. The grounds alleged for this limitation on discovery were based on comments by Lacey which were defamatory of a large number of individuals.

At a hearing on the prosecutor's motion, the trial court allowed the defense to exam-

ine the statement under certain limitations. The defense then sought a continuance of the trial setting, asserting Lacey's comments could not be adequately investigated in the short period remaining prior to the scheduled trial date. The continuance was granted. With this continuance, the record shows the Lacey statement was made available to the defense two months prior to trial.

■ Defendant claims the delay in making the Lacey statement available was error. "Defendant should have been able to investigate the substance of Lacey's statement as soon as possible to the time the interview was given, in order to preserve any evidence, and talk to any witnesses, that the Defendant felt was necessary in his defense." The claim is frivolous. Assuming, but not deciding, that Lacey's statement could be considered material to the preparation of the defense, the contents of the statement do not indicate any prejudice to defendant by the delayed disclosure, and defendant advances nothing indicating any prejudice. *Chacon v. State*, 88 N.M. 198, 539 P.2d 218 (Ct.App.1975).

(b) The trial court's limitations upon defendant's use of Lacey's statement were:

[T]hat no portion of this statement be communicated to any person other than the Defendant and further that no portion of the statement shall in any manner be copied or in any manner reduced to writing and said statement shall be returned to the undersigned Judge within 20 days of the date hereof.

Defendant contends that the limitations upon the use of Lacey's statement denied him the right to properly prepare for trial. This argument assumes that the contents of the statement were material to the preparation of the defense. At this point, we again assume, but do not decide, that the contents were material.

There are two answers to the claim of improper limitations on the use of the statement.

■ First, how was defendant prejudiced? Defendant advances nothing indicating the preparation of the defense was in any way harmed by the limitations. *Chacon v. State*, supra.

■ Second, the trial court could properly place limitations on the use of the statement. Where, as here, the prosecutor had refused disclosure, the trial court may require disclosure of relevant material under Rule of Crim.Proc. 27(e), unless:

(2) there is substantial risk to some person of physical harm, intimidation, bribery, economic reprisals or unnecessary annoyance or embarrassment resulting from such disclosure, which outweighs any usefulness of the disclosure to defense counsel.

Here there was disclosure to defense counsel and to defendant. The limitations imposed by the trial court were designed to prevent disclosure to others. Lacey's statement, unsworn, is full of defamatory comments concerning a number of persons. There is nothing indicating disclosure of the defamatory comments to anyone other than defendant and his counsel had any usefulness. Disclosure of the unsworn defamatory comments would, in these circumstances, have been an unnecessary embarrassment to those who were the object of the comments.

(c) When he learned of the existence of the Lacey statement, and its nondisclosure, the prosecutor was upset. The transcript indicates the prosecutor threatened to have the officers who questioned Lacey fired. The two officers were discharged by the sheriff, and an inference from the tendered evidence is that the discharges related to nondisclosure of the Lacey statement.

The two officers were called as witnesses by the prosecutor. Defendant sought to cross-examine them as to why they had been discharged from the sheriff's department. Defendant claimed the reason for their discharge would show bias of the witnesses against the defendant because, if defendant were convicted, their reputations would be cleared. This contention approaches the frivolous.

572

The officers withheld the statement from both the defense and the prosecutor. If the prosecutor caused them to be discharged, how does the fact of discharge show bias toward the defendant? The fact that defendant was convicted does nothing toward clearing the officers of the fact that they withheld the statement, and may have been discharged because of the withholding. The bias of a witness is relevant because it affects the credibility of the witness. *State v. Santillanes*, 86 N.M. 627, 526 P.2d 424 (Ct.App.1974). Cross-examining the officers as to the reason for being discharged would not have shown they were biased against defendant. *State v. Wesson*, 83 N.M. 480, 493 P.2d 965 (Ct.App.1972).

■ *State v. Burkett*, 33 N.M. 159, 262 P. 532 (1928) approves a liberal approach as to the extent of cross-examination to test the bias, or credibility, of a witness. The decisions, however, are to the effect that "the matter of cross-examination, to test credibility, is largely within the discretion of the trial court." *State v. Burkett, supra.* Where, as here, the tendered cross-examination has been denied, the appellate issue is whether the trial court's ruling was an abuse of discretion. *State v. Williams*, 76 N.M. 578, 417 P.2d 62 (1966); *State v. Roybal*, 33 N.M. 540, 273 P. 919 (1928); *State v. Burkett, supra; State v. Wesson, supra.* This approach is reflected in Evidence Rule 611, which places "reasonable control" in the trial court.

■ Even if the questions concerning the reason the officers were discharged could somehow be considered as showing bias against the defendant, the trial court did not abuse its discretion in excluding such questions. There was no abuse of discretion because of the nature of the testimony of the officers; the testimony went only to gathering evidence—guns, bullets, the arrest of defendant and defendant's statement—after the crimes had been committed.

(d) The defense called Lacey as a witness at trial. Prior to any testimony by Lacey, defendant asked to be furnished a copy of Lacey's statement "[f]or the purpose of this examination". The trial court denied the request, ruling that the statement had no probative value on any of the issues in the case. Defendant asserts this ruling was error.

Defendant's direct examination of Lacey brought out that Lacey knew nothing about the matters being tried. Defendant then questioned Lacey about hiring someone to kill Tessier. Lacey testified that he had not hired anyone, did not know who did, could only speculate concerning a hiring, and had no factual basis for any speculation.

Defendant then inquired as to what he had told the officers, in his statement, regarding a "contract" on Tessier. Lacey testified that he had no recollection of telling the officers that certain other people were involved in a "contract on Tessier". Lacey was then asked if, in his statement, he had referred to crimes committed by Lacey and Tessier. Lacey denied making any such statement. Defendant then requested Lacey's statement "to impeach this witness." Defendant contends the denial of this request was error.

■ In his statement, Lacey did discuss a contract on Tessier's life, but his comments were not on the basis of personal knowledge; rather, Lacey's comments were either hearsay or speculation. Lacking any personal knowledge about the contract, the trial court properly denied use of the statement to examine Lacey at trial because the statement had no probative value.

■ In addition, none of Lacey's comments about the contract involved defendant; rather, they went to Scott and another named individual, neither of whom were being tried. Because Lacey's hearsay and speculative comments about the contract on Tessier did not involve defendant, the contract was a collateral issue. "[T]he extent that evidence on a collateral issue is to be permitted is within the trial court's discretion." *State v. Alderette*, 86 N.M. 600, 526 P.2d 194 (Ct.App.1974); *State v. Moraga*, 82 N.M. 750, 487 P.2d 178 (Ct.App. 1971); see *State v. Marquez*, 87 N.M. 57, 529 P.2d 283 (Ct.App.1974). There was no

abuse of discretion under the circumstances of this case.

■ Even though hearsay or speculation, in his statement, Lacey did make comments about persons involved in a contract on Tessier's life. In his statement, he did refer to alleged crimes that he committed with Tessier. Thus, his trial testimony was inconsistent with his statement. However, the trial court's refusal to allow defendant to use Lacey's statement to impeach Lacey's trial testimony was not error because Lacey did not testify to anything about the crimes or of defendant's involvement or lack of involvement. There was nothing to impeach. Refusing to permit use of the statement to impeach Lacey was not an abuse of discretion. *State v. Burkett*, supra.

(e) In refusing defendant's requests to use Lacey's statement during Lacey's trial testimony, the trial court admitted the statement "in evidence as a tender and for only that purpose, for the purpose of review by the Higher Court as to the Court's ruling".

Defendant asserts the trial court's remark, in the presence of the jury, denied him a fair trial because the remark was "a supposition" that defendant would be convicted. Defendant asserts this was error under *State v. Thayer*, 80 N.M. 579, 458 P.2d 831 (Ct.App.1969). *Thayer* held that an unintentional comment by the trial court, which tends to express the court's view as to the guilt of the accused, is prejudicial.

■ One of the reasons for a tender of evidence is to have the excluded evidence in the record for purposes of appellate review. *State v. Shaw*, 90 N.M. 540, 565 P.2d 1057 (Ct.App.1977). That is what the trial court did in this case. Including the statement in the record for that purpose did not tend to express any view by the court concerning defendant's guilt; the trial court did no more than explain the basis for admitting the statement as a tender. Compare *State v. Gurule*, supra.

After the jury is selected and sworn, Rule of Crim.Proc. 40(b) provides that initial instructions as provided in U.J.I.Crim. "shall be given". Included in the initial instructions, U.J.I.Crim. 1.00, is the instruction:

No statement, ruling, remark or comment which I make during the course of the trial is intended to indicate my opinion as to how you should decide the case or to influence you in any way.

The appellate record of the trial begins with the testimony of a witness; neither the jury selection nor the trial court's opening remarks have been included. However, defendant does not claim that the above-quoted instruction was not given. In light of the record, we cannot say that the trial court's remark was understood by the jury as "a supposition" that defendant would be convicted.

*Discovery of Grand Jury Transcript*

A grand jury investigated the accusations made by Lacey in his statement. This grand jury did not indict defendant, he was charged by information. Nor is there any indication that the grand jury investigated the matter which resulted in charges against defendant.

Prior to trial, defendant sought to obtain the grand jury transcript in order to impeach witnesses on the basis of inconsistent statements. The trial court correctly pointed out that if a witness did not testify before the grand jury concerning defendant's case, defendant would not be entitled to a transcript of that witness's grand jury testimony. See *State v. Vigil*, 85 N.M. 735, 516 P.2d 1118 (1973). At the hearing on this motion, the grand jury transcript was not available; the trial court deferred a ruling. Defendant was to identify to the court the witnesses whose grand jury testimony defendant sought to obtain. The trial court would then review the grand jury testimony of the witnesses and determine if the witnesses' grand jury testimony related to defendant's case.

■ Before calling Lacey as a witness, defendant asked for a transcript of Lacey's grand jury testimony. In denying

**574**

the request, the trial court stated that the grand jury proceedings were "no way involved in this matter." Relying on *Valles v. State,* 90 N.M. 347, 563 P.2d 610 (Ct.App. 1977) defendant states: "Whether or not there is anything in the Grand Jury testimony that might aid the Defendant should not be determined by the Court." Defendant would apply *Valles* out of context. *Valles* follows *State v. Vigil,* supra, in holding that defendant is not entitled to a grand jury transcript unless the witness has testified at the criminal trial about that which he testified before the grand jury. Unless the witness testified before the grand jury about the matter being tried, defendant is not entitled to the grand jury transcript. Unless the witness testifies at the criminal trial about the matter being tried, defendant is not entitled to the grand jury transcript. *State v. Felter,* 85 N.M. 619, 515 P.2d 138 (1973).

■ The trial court could properly determine that Lacey did not testify before the grand jury concerning defendant's case. This is more than a determination of whether there is anything in the grand jury transcript that might aid defendant; it is a determination that there is nothing about defendant's case in the witness's grand jury

testimony. The trial court, to preserve the secrecy of grand jury proceedings, properly makes that determination. See the discussion in *State v. Morgan,* 67 N.M. 287, 354 P.2d 1002 (1960).

■ We do not decide this issue solely on the basis that the trial court could properly determine that Lacey's grand jury testimony had nothing to do with defendant's case. In addition, Lacey did not testify to anything at defendant's trial concerning defendant's case. Thus, the requirement that the witness testify about the matter being tried was not met. Defendant was not entitled to a transcript of Lacey's grand jury testimony.

The judgment and sentences are affirmed.

IT IS SO ORDERED.

HERNANDEZ and LOPEZ, JJ., concur.