828 P.2d 980

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**James Charles GIBSON, Defendant–
Appellant.**

No. 12472.

Court of Appeals of New Mexico.

Feb. 10, 1992.

Certiorari Denied Feb. 17, 1992.

Tom Udall, Atty. Gen., Margaret McLean, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

Robert J. Jacobs, Taos, for defendant-appellant.

## OPINION

HARTZ, Judge.

After his first trial ended in a mistrial, Defendant was retried and convicted of several offenses arising out of an escape by five inmates from a state correctional facility. On appeal he raises numerous issues relating to his conviction and sentence. We affirm.

## I. EVIDENTIARY SUPPORT FOR THE CONVICTIONS

### A. *Summary of the Evidence*

On January 7, 1985, Robert Davis, Anthony Gutierrez, Roy Schrivner, Arthur Facteau, and Mark St. Clair escaped from

the Central New Mexico Correctional Facility in Los Lunas.

Prison guard Gerald Merrill testified that he was on duty at the prison warehouse at the time of the escape. Schrivner was working at the warehouse. Merrill allowed Davis into the warehouse when Davis stated that he had some legal papers for Schrivner. Merrill heard a truck outside the warehouse, by a bay door. He opened the bay door and allowed the truck to back up to the warehouse platform. The truck was a U-Haul rental driven by Patrick Perez. Perez told Merrill that he was there to pick up some old tires. Merrill told Perez that there were no tires in the warehouse and they were probably in another building. While Merrill went to make a call to determine where the tires were, Perez asked to use the bathroom. Schrivner took him there. When Perez left the bathroom, Merrill escorted him back to the truck and Perez drove off. Schrivner then went to the bathroom and Merrill returned to his office. He came out of his office when St. Clair, who had been at the warehouse for a short time earlier in the day, knocked on the door. St. Clair and Schrivner told Merrill that there was freon leaking in the walk-in cooler. When Merrill entered the cooler he encountered Davis, who pointed a gun at him. Merrill was handcuffed and locked in the cooler for about three hours before he was discovered by prison authorities. He was in shock and in fear of his life, having no doubt that the gun would have been used if necessary.

Gutierrez testified for the State as follows: Defendant met with Davis and him at the prison at least three times to plan the escape. At the first meeting they discussed getting a gun, a U-Haul truck (as an escape vehicle), and a getaway car. Defendant said that he would help provide everything. At the second meeting Defendant said that he needed money to buy a gun and rent the vehicles. Gutierrez had his girlfriend give Defendant $300. Defendant was to meet a friend of Gutierrez to purchase the gun. At the third meeting Defendant told Gutierrez and Davis that he had obtained the guns and everything was ready. The escape was originally set for

January 1, but the date had to be changed when Defendant told them that the driver of the escape vehicle had backed out. When the escape took place, Perez, who was disguised by orange hair and a bandaged nose, drove the U-Haul truck and brought a gun. Defendant and Perez had both told Gutierrez that Defendant taught Perez to drive. Gutierrez and the other escapees got into the truck and hid behind a false wall. Defendant, Davis, and Gutierrez had come up with the idea for a false wall, which Defendant had constructed. About ten or fifteen minutes after the truck left the prison, everyone got out and entered a station wagon driven by Defendant. They drove to a house in Albuquerque that had been rented in Perez' name. Defendant left after about thirty minutes. Defendant provided the escapees with bullets, clothes, food, money, an ID machine, a police scanner, a telescope, and binoculars.

Cyndee Plehn testified that she was working in traffic control at the main gate of the prison at the time of the escape. On the morning of the escape she stopped Perez when he drove up in a U-Haul truck. He produced a work order to pick up a hydraulic jack. He gave his destination as the prison sally port. His hair was dyed orange and he had a gauze bandage over his nose. Despite the disguise, she recognized Perez because he was a former inmate.

Isleta Police Officer Bernie Trujillo testified that on the morning of January 7, 1985, he responded to a call reporting an abandoned U-Haul truck on Highway 85. The door was open and there was a key in the ignition. There was a strong odor of paint in the back of the truck.

Testimony of Gail Stokely at Defendant's first trial was admitted after the court determined that she was unavailable for the second trial. She worked for the U-Haul store where the truck had been rented. She examined the abandoned truck and noted a false wall inside. The truck had been rented on January 6. She identified Defendant as someone she had seen in the store on one or two occasions.

State Police Officer Tommy Otero was assigned to investigate the escape. He testified that after Plehn identified Perez as the driver of the U–Haul, he examined the prison logbooks and determined that Perez had visited Davis on January 3. The log provided the license number of the vehicle Perez was driving. The vehicle was registered to Ugly Duckling Car Rental, whose records provided the address of Defendant and Perez. Otero participated in a search of their apartment. The paint used inside the U–Haul appeared to be the same as that found on paint rollers discarded in front of the apartment. He interviewed employees at the U–Haul store where the escape vehicle was rented. The rental agreement was dated January 6. The name on the agreement was "Sam Peterson." The description the employees gave of Peterson matched the physical characteristics of Perez. A California driver's license bearing the name "Sam Peterson" (but without a photograph) was later found in the possession of escapees St. Clair and Schrivner.

State Police Officer Michael Francis testified that he found paint rollers, paint brushes, and a paint pan outside of Defendant's apartment. After obtaining a search warrant, he entered the apartment and found utility bills in the name of Perez, ammunition, a list of radio codes used by the police, a photograph of Defendant and Davis together in the prison visiting room, several items addressed to Davis, and several items addressed to Davis and Facteau. He also found a checklist of twenty-one items. Several of the entries appeared to refer to the escape, such as "$$ before xmas"; "Pat–glsses-(expendibility?)"; "pln z (go over); green light be 4 xmas"; "Reconnoiter Prk & othr swtch plce"; and "Servomation [the food service for the prison]." He believed that a rough sketch drawn on the list was a plan for the false wall in the U–Haul. He reviewed the log for the prison sally port and found that on January 7, 1985, it contained the name "Sam Peterson." Defendant called Francis in late January 1985. Defendant said that it was not in his interest to return to New Mexico as he feared for his life. Defendant offered to help find the remaining escapees if he was granted immunity. Francis told Defendant that he could not make a deal, and Defendant said that he would not come back.

Joanne Duran testified that she was a former girlfriend of Defendant and had lived with him in his apartment until November 1984, after Perez moved in. Perez was very submissive and would do what Defendant told him. Defendant told her that he had taught Perez how to drive. Defendant introduced her to Davis, who often called Defendant from prison. Defendant visited Davis in prison on January 2, 1985. Before the escape, Defendant had asked her if she would act as a lookout. She refused. He called her the morning of January 7, the day of the escape, to say goodbye and that he was going to San Diego. He called her again that evening to ask her to watch the news to see if anything unusual had happened. Later in January Defendant called her from Mexico. She visited him there several times, first in mid-February. He was using the name "Jaime Rivera." He told her that he had left his parents' home in San Diego and gone to Mexico when he saw police officers near the home. Sometime after the escape Defendant began to ask her to marry him, telling her that if she did, she would not have to testify against him. Defendant told her that he had dyed Perez' hair orange. The handwriting on the checklist found by Officer Francis was Defendant's. Defendant had a police scanner in his apartment. On cross-examination she testified that she and Defendant had painted her house white, using a paint pan and rollers, and had rented a U–Haul truck to move their belongings.

Lucille Urioste testified that she met Defendant through Duran. Duran asked her if she would allow Defendant to use her credit card to rent a car. In November or December of 1984 she went with Defendant to Ugly Duckling Car Rental. Defendant used her credit card to rent an older model station wagon.

Erma Ruiz and her sister, Rebecca, testified that they were neighbors of Defendant

and Perez, who visited their apartment occasionally. Erma Ruiz testified that in December 1984 she gave Defendant a ride to a U–Haul rental store. She dropped him off and drove away. Defendant and Perez appeared to be good friends. Perez looked up to Defendant, who dominated him.

Everett LeMaster, superintendent of correctional security, testified that Perez had visited Davis at the prison. He knew Perez from when Perez was an inmate. Ex-felons are permitted to visit inmates at the prison. He knew Defendant and had seen him visiting Davis a few days before the escape. He had inspected the U–Haul truck after the escape and noted a false wall painted white in the truck's cargo area.

Bryan Culp, who worked at the prison at the time of the escape, testified that the visitor's log indicated that Defendant had visited Davis on January 2 and Perez had visited Davis on January 3. The license plate numbers on the log showed that both drove the same vehicle. The plate number belonged to the vehicle that had been rented by Defendant.

Defendant called four witnesses. The first witness, Cory Fine, was qualified as an expert in policies and procedures of New Mexico correctional institutions. He testified about the procedures used to prohibit the introduction of contraband, such as searching packages of visitors. He also stated that inmates are not allowed to take photographs in the visiting room.

Roy Anuskewicz, an Albuquerque attorney, testified that he had known Defendant for twelve to thirteen years. During the period from 1981 to 1984 Defendant stopped by his office regularly to borrow books and ask questions. He believed that Defendant was working as a paralegal at the time. Defendant was currently working as a law clerk.

Glen Williamson, a former attorney of Defendant, testified that he had interviewed Joanne Duran in preparation for trial. At that time Duran indicated to him that she had no information about Defendant's planning or carrying out the escape

and that she had never seen a firearm in his apartment.

Defendant's mother testified that he spent some time with her in San Diego in January 1985 before he went to Mexico. She was quite frightened when police officers surrounded her home, looking for Defendant.

### B. *Sufficiency of the Evidence*

Defendant contends that the district court erred in denying his motions for directed verdict with respect to the charges of furnishing articles for prisoner's escape, NMSA 1978, § 30–22–12 (Repl.Pamp.1984), assault by a prisoner, NMSA 1978, § 30–22–17 (Repl.Pamp.1984), aggravated assault upon a peace officer, NMSA 1978, § 30–22–22 (Repl.Pamp.1984), and false imprisonment, NMSA 1978, § 30–4–3 (Repl. Pamp.1984).

■ With respect to the charge of furnishing articles for escape, Defendant argues that there was insufficient evidence that Defendant furnished a gun to the inmates. This contention has no merit. There was evidence that (1) Defendant planned the escape with Gutierrez, Davis, and Perez; (2) Defendant agreed to provide a gun for the escape and said that he had obtained the gun; (3) Perez delivered the gun to the escapees by leaving it in the warehouse bathroom; and (4) after the escape Defendant provided bullets for the gun. The jury could properly draw the inference that Defendant supplied the gun.

■ With respect to the other offenses, Defendant does not deny that the offenses occurred but contends that there was insufficient evidence to establish that Defendant was an accessory to them. He cites *State v. Ochoa*, 41 N.M. 589, 599, 72 P.2d 609, 615 (1937) for the proposition that aiders and abettors "must share the criminal intent of the principal." We agree that *Ochoa* controls. Indeed, the district court instructed the jury that to find Defendant guilty as an accessory, the State must prove that "defendant intended that the crime be committed." We disagree, however, with the contention that the evidence did not support the jury's finding. This

was not a spontaneous escape. The evidence concerning the planning, such as the testimony by Gutierrez, and the description of how Defendant and his cohorts effected the escape established that the procedure for the escape was carefully orchestrated. The jury could readily infer that Defendant planned, anticipated, and intended the assault and false imprisonment. Although Defendant notes that one element of the offense of assault on a peace officer is knowledge of the identity of the officer, *see Reese v. State*, 106 N.M. 505, 745 P.2d 1153 (1987), Defendant need not have known the peace officer's name. He need only have known that the victim would be a peace officer. Thus, it was not necessary that Defendant anticipate that Merrill would be the officer at the warehouse, but only that the person in charge of the warehouse would be a peace officer. The jury could properly make that finding.

### C. *Merger*

■ Defendant argues that the charge of assault by a prisoner should merge for sentencing purposes with the charge of false imprisonment and the charge of assisting escape should merge with the charge of furnishing articles for escape. He relies on *State v. DeMary*, 99 N.M. 177, 655 P.2d 1021 (1982), for the proposition that he cannot be sentenced on two offenses if under the facts of the case he could not have committed one offense without also committing the other.

Defendant's first merger claim appears to be based on a misconception of the assault charge against him. One means of committing the offense of assault by a prisoner is by confining or restraining an officer of a penal institution with intent to use such person as a hostage. § 30–22–17(C). That alternative means of committing the offense may encompass false imprisonment as a lesser included offense. The district court, however, did not instruct the jury on that alternative. The instruction informed the jury that to find Defendant guilty of accessory to assault by a prisoner, it had to find that Defendant "aided and abetted Robert Davis in threatening Gerald Merrill with a firearm."

With this clarification, we can readily dispose of the first merger claim. We do not follow *DeMary* because it is not the governing law. Our supreme court has set forth the proper analysis for questions of merger in its recent decision in *Swafford v. State*, 112 N.M. 3, 810 P.2d 1223 (1991). Under that decision, merger is inappropriate here for two reasons. First, the criminal statute prohibiting assault and the criminal statute prohibiting false imprisonment advance two distinct social norms. *See id.* at 14, 810 P.2d at 1234; *State v. Bachicha*, 111 N.M. 601, 606–08, 808 P.2d 51, 56–58 (Ct.App.1991) (Hartz, J., specially concurring). Second, the facts supporting the assault charge and the facts supporting the false imprisonment charge are not identical. Even absent the assault, the offense of false imprisonment was accomplished by locking Merrill in the cooler. *See Swafford*, 112 N.M. at 13–14, 810 P.2d at 1233–34; *Bachicha* (separate facts support convictions for assault and false imprisonment).

■ For his second merger argument, Defendant contends that the charges of assisting escape and furnishing articles for escape must merge because "[t]he only evidence at trial was that Defendant furnished transportation to the inmates," and he "could not have committed furnishing articles without also committing assisting escape." We disagree. We need not determine whether the two criminal statutes (assisting escape and furnishing articles for escape) advance distinct social norms, because even if they do, merger is not required when the facts supporting the convictions are not identical. *See Swafford*. The jury could have found Defendant's participation to be much greater than just furnishing a vehicle. In fact, the jury could properly have found that Defendant's participation in the escape extended significantly beyond furnishing tangible objects to effect the escape and included such activities as helping to plan the escape, teaching Perez to drive, and driving the getaway station wagon himself. In these circumstances, the charges did not merge.

## II. LEGALITY OF THE SEARCH

Defendant challenges the search of his apartment pursuant to a warrant. He complains that the warrant was not supported by probable cause and that the search exceeded the scope of the warrant.

■ On the issue of probable cause, Defendant claims that the affidavit failed to establish the veracity of the informants and that the factual assertions in the affidavit suggest only guilt by association. Defendant does not specify the portions of the affidavit that should not be considered because they are statements by informants of unproved credibility, except to mention information that came from Defendant's neighbors. One neighbor with whom the affiant spoke was Rebecca Ruiz, who stated that she had seen Defendant with a U–Haul truck and that on the date of the escape Defendant had asked her to return a hammer that she had borrowed. The other neighbors are not identified by name, but by address. The affidavit states that the neighbors identified Defendant and Perez as residents of the apartment to be searched. The credibility of the neighbors need not be established by additional information, because they are citizen-informers, who are presumed to be reliable. The nature of the statements made and the circumstances in which they were given suffice to establish credibility for the purpose of determining probable cause. *See State v. Hernandez*, 111 N.M. 226, 804 P.2d 417 (Ct.App.1990); *State v. Therrien*, 110 N.M. 261, 263–64, 794 P.2d 735, 737–38 (Ct.App. 1990). As for the other sources whose identities are not provided in the affidavit, the nature of the information provided (such as the means of the escape) strongly suggests that the sources were law enforcement and prison officials, who are also presumed to be reliable. 2 Wayne R. La-Fave, *Search & Seizure* § 3–5(a) (2d ed. 1987). The affidavit could (and should) have been drafted with greater precision. But reading the affidavit in a "common-sense, non-technical manner," *State v. Wisdom*, 110 N.M. 772, 777, 800 P.2d 206, 211 (Ct.App.1990), the reliability of the sources is sufficiently established.

■ The information provided by the various sources noted in the affidavit established much more than simply guilt by association: one resident of the apartment was the driver of the U–Haul truck in which the inmates escaped; the other resident had been seen with a U–Haul truck; the residents of the apartment had each visited escapee Davis less than a week before the escape; after the truck was abandoned by the escapees, it was found to contain a hammer similar in description to the one Ms. Ruiz had just returned to a resident of the apartment; and in a trash can outside the apartment were found (a) nails and screws that could have been used to install a false white wall built into the U–Haul and (b) a paint tray and roller with white paint on them. This evidence connecting Defendant, his roommate, and their apartment to the escape established probable cause to search the apartment for further evidence relating to the escape.

■ As for the contention that the search exceeded the scope of the warrant, the warrant authorized a search for the property described in the affidavit. The described property included "writings and instrumentalities concerning the escape." The seized document that Defendant challenges is the checklist about which Officer Francis testified. Entries on the checklist sufficiently tied it to the escape to justify its seizure. The officers did not exceed the scope of the warrant.

## III. ALLEGED ERRORS IN THE CONDUCT OF THE TRIAL

### A. *Alleged Comment by Judge*

■ During the testimony of Gutierrez a power outage caused the lights to go off in the courtroom. Because of the outage the tape recorder did not record what, if anything, the judge said. Defendant alleges that the judge asked Gutierrez "if this was another escape." This issue is not before us for review, because there is no record of the alleged comment and Defendant did not raise the issue in the district court. *See State v. Martin*, 101 N.M. 595, 603, 686 P.2d 937, 945 (1984) (matters not

of record cannot be reviewed on appeal); SCRA 1986, 12–216(A) (question on appeal must have been preserved below). In any event, the comment would not entitle Defendant to a new trial. There was no dispute that Gutierrez had escaped from prison. The comment did not reflect adversely on Defendant.

### B. *Husband–Wife Privilege*

 Defendant contends that the district court abused its discretion in refusing to allow Glen Williamson (a prior attorney of Defendant) to testify concerning the husband-wife privilege. Joanne Duran had testified that Defendant had asked her to marry him so that she could not testify against him. Defendant proffered Williamson's testimony to explain that the privilege would not have applied in such circumstances. We sustain the district court's ruling on two grounds. First, such an explanation of the privilege may well have confused rather than enlightened the jury. The issue was whether Defendant thought that the marriage could prevent her from testifying, not whether Defendant's view of the law was correct. The district court acted within its discretion in excluding the testimony on that ground. *See* SCRA 1986, 11–403. In addition, testimony from Defendant's former attorney would not have been the appropriate manner of presenting the law to the jury. Rather, Defendant should have requested the court to instruct the jury regarding the privilege. *See Marx & Co. v. Diners' Club, Inc.,* 550 F.2d 505, 508–10 (2d Cir.), *cert. denied,* 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). The district court did not abuse its discretion in refusing to permit Williamson to testify regarding the privilege.

### C. *Cross–Examination of Gutierrez*

 Defendant contends that he was deprived of an opportunity to cross-examine Gutierrez adequately concerning Gutierrez' plea agreement with the State. The plea agreement was disclosed at trial: Gutierrez was not charged as an habitual offender; he was sentenced to a term of four-and-a-half years for escape, instead of

a possible nine; and he was placed in semi-protective custody. The district court sustained objections to questions on cross-examination that asked whether it was true that (1) unlike other escapees he had not been charged with false imprisonment or aggravated assault, and (2) his girlfriend was never charged with a crime even though she picked him up after the escape. The court ruled that the questions were irrelevant, because there was no evidence that failure to bring the charges was part of the plea bargain. Although we may have permitted such cross-examination, we defer to the trial judge with respect to control over cross-examination; we reverse only for an abuse of discretion. *See* SCRA 1986, 11–611; *State v. Davis,* 92 N.M. 563, 572, 591 P.2d 1160, 1169 (Ct.App.1979). We find no abuse of discretion in the district court's ruling.

### D. *Evidence of Defendant's Post–Escape Activity*

 Defendant complains of the admission of testimony by Joanne Duran concerning his activities after the escape. She testified that when the police came to his parents' home in California, Defendant hid and fled across the border to Mexico. She also testified that he used the alias "Jaime Rivera" while he was in Mexico. We find no error. The evidence was clearly admissible to show consciousness of guilt. *See State v. Trujillo,* 95 N.M. 535, 541–42, 624 P.2d 44, 50–51 (1981).

### E. *Comment on Defendant's Parole Status*

 At the time of the escape, Defendant was on parole. Although his parole officer had granted him permission to be in California for a brief period extending until a few days after the escape, he was generally restricted to New Mexico. Defendant's parole status was relevant to the charges against him in that Defendant's violation of the conditions of parole by traveling to California (and then Mexico) was probative of consciousness of guilt. *See id.* The jury could properly conclude that only the strongest of motives would

have induced Defendant to risk re-incarceration by breaching the conditions of his parole. Nevertheless, it was apparently agreed by the parties or ordered by the court that there be no mention during trial of Defendant's parole status.

■ Parole was mentioned, however, in the testimony of Everett LeMaster, superintendent of correctional security. LeMaster testified that Perez, whom he had known as an inmate, had visited Davis at the prison. He also testified that he knew Defendant and identified him in the courtroom. The following exchange then occurred:

Q. (Prosecutor): Do you know if James Gibson, the Defendant, visited Bob Davis in 1984–85?

A. (LeMaster): Yes, sir. I seen him in the institution, after he was on parole.

After a pause, defense counsel asked to approach the bench. The judge began the bench conference by noting the reference to parole and asking if defense counsel was going to object. Defense counsel moved for a mistrial. The judge denied the motion, saying that the jury did not hear the reference to parole and the prosecution had not intended to elicit it. The next day defense counsel renewed the mistrial motion, submitting an affidavit by Defendant's wife that she had heard the parole comment while sitting in the gallery at a distance from the witness of about three times the distance between the witness and the jury. The judge denied the motion, saying that the witness's comment would not justify a mistrial even if the jury heard it. The judge offered to give a cautionary instruction, but defense counsel declined the offer.

Of course, if the jury did not hear the reference to parole, there would be no reason for a mistrial. Although we have listened to the tape recording of LeMaster's testimony, we are not confident that we can make an independent determination of whether the word "parole" was sufficiently loud and distinct for the jury to hear. Therefore, we defer to the district court's observation concerning whether the reference to parole was heard by the jury.

■ Even if the jury clearly heard the word "parole," we are not persuaded that failure to declare a mistrial was an abuse of discretion. To be sure, evidence of a defendant's prior criminal conduct can be highly prejudicial; if such evidence is not admissible for a specific purpose permitted by the rules of evidence, *see* SCRA 1986, 11–404(B), –608(B) & –609, admission of the evidence can require reversal of a conviction. *See State v. Saavedra,* 103 N.M. 282, 705 P.2d 1133 (1985). Here, however, there were mitigating factors. The reference to parole was not emphasized by the witness or the prosecution. In addition, the improperly prejudicial impact on the jury from Defendant's prior conviction may well have been marginal because of the tarnish to Defendant's image created by the repeated testimony establishing his close relationship with convicted felons, especially Perez and Davis. *See United States v. Burnett,* 582 F.2d 436, 439 (8th Cir.1976). We also note that the court's offer to give a cautionary instruction was declined by defense counsel. Failure to accept the court's offer of a cautionary instruction may in itself justify a refusal to grant a mistrial; a well-constructed instruction can dissipate the prejudice, particularly when the improper remark was somewhat ambiguous and not emphasized by the witness or counsel. *See State v. Nichols,* 104 N.M. 74, 75, 717 P.2d 50, 51 (1986); *United States v. Doby,* 598 F.2d 1137, 1142 (8th Cir.1979) (" 'The jury should not infer from anything that occurred during the proceedings that the defendant had any prior experience with the law.' "). *Cf. Callaway v. State,* 109 N.M. 416, 417, 785 P.2d 1035, 1036, *cert. denied,* 496 U.S. 912, 110 S.Ct. 2603, 110 L.Ed.2d 283 (1990) (after witness made unsolicited improper remark, court should have given admonition to jury rather than declare mistrial).

Finally, "[a] non-constitutional error is harmless unless it had a 'substantial influence' on the outcome or leaves one in 'grave doubt' as to whether it had such effect." *United States v. Rivera,* 900 F.2d 1462, 1469 (10th Cir.1990) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66

S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)). The considerations discussed above, together with the strength of the evidence against Defendant, convince us that any error deriving from LeMaster's reference to parole was harmless. *See United States v. Doby; United States v. Burnett; United States v. Hernandez–Miranda*, 601 F.2d 1104 (9th Cir.1979).

## IV. MOTIONS TO DISMISS

Defendant moved to dismiss the charges against him on the grounds that (1) the circumstances of his apprehension in Mexico deprived New Mexico courts of jurisdiction over him, and (2) pre-indictment delay violated his constitutional rights to speedy trial and due process. The district court conducted two hearings on the motion.

### A. *Personal Jurisdiction*

■ Defendant contends that mistreatment of him while he was in custody in Mexico deprives New Mexico of authority to prosecute him. He cites several cases in support, but in only one, *United States v. Toscanino*, 500 F.2d 267 (2d Cir.1974), did the court hold that a jurisdiction could be deprived of the right to prosecute the defendant because of improprieties in the transfer of the defendant to the jurisdiction. Other courts have questioned *Toscanino*, noting that the United States Supreme Court has repeatedly refused to suppress the person of the defendant as the fruit of an unlawful arrest. *See United States v. Pelaez*, 930 F.2d 520, 525 (6th Cir.1991).

In any event, *Toscanino* is clearly distinguishable. In that case the defendant had been kidnapped from a foreign country, with no attempt to comply with extradition treaties. The removal of the defendant from the foreign country was itself in violation of law. Here, in contrast, the United States authorities attempted to comply with our extradition treaty with Mexico, and Defendant has failed to point to any specific violation of that treaty. The misconduct upon which Defendant relies is alleged brutality by Mexican authorities while he was in their custody awaiting extradition. The alleged brutality, however, was extrinsic to Defendant's arrest and extradition, and the district court was entitled (1) to disbelieve most of the allegations of brutality and (2) to find that United States officials played no role in any misconduct that did occur. *See Toscanino*, 500 F.2d at 281 (violation of defendant's rights must be "by or at the direction of United States officials").

We reject Defendant's claim that New Mexico was deprived of authority to prosecute Defendant because of what occurred in Mexico.

### B. *Speedy Trial and Due Process*

■ On appeal Defendant contends that delays in the proceedings against him violated his right to a speedy trial and his right to due process of law. In the district court he predicated these contentions solely on pre-indictment delay. Because the State therefore had no occasion to make a record relating to delays occurring after Defendant's indictment, we restrict our analysis to the pre-indictment period. We first address the speedy trial claim.

In *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the United States Supreme Court established the framework for evaluating a claim of denial of the right to a speedy trial. *Barker* instructs us to weigh four factors: (1) length of delay, (2) prejudice to the defendant caused by the delay, (3) reason for the delay, and (4) assertion of the right to a speedy trial. *Id.* at 530, 92 S.Ct. at 2192. *Accord Salandre v. State*, 111 N.M. 422, 425, 806 P.2d 562, 565 (1991). Although the delay between the alleged offense and Defendant's trial was very long and Defendant was in prison for a lengthy period prior to trial, the balance weighs in favor of the State because of the reasons for the delay and Defendant's failure to seek a speedy trial prior to the indictment.

### 1. Length of Delay

The escape occurred on January 7, 1985. Two weeks later the State filed an arrest warrant charging Defendant with assisting escape and harboring a felon. In July 1985

a federal warrant was issued charging Defendant with unlawful flight to avoid prosecution. Defendant was arrested on the federal warrant in Mexico on October 17, 1986. He was then extradited to California, where he was incarcerated until he was returned to New Mexico on February 3, 1988. He was indicted on February 12, 1988, tried for the first time in August 1989, and retried on March 26, 1990.

The first question to arise is when Defendant's right to a speedy trial attached. The possibilities include (1) January 1985, the date of filing the first formal charge by the State—the arrest warrant; (2) October 17, 1986, the date of Defendant's arrest in Mexico on the federal charge; and (3) February 3, 1988, the date on which Defendant was first held in custody on the New Mexico charges. *See generally* 2 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 18.1(c) (1984). We assume, without deciding, that the right attached in January 1985. The delay until the trial at which Defendant was convicted encompasses more than five years. A five-year delay is presumptively prejudicial and therefore requires examination of the three other factors. *See Salandre*, 111 N.M. at 428, 806 P.2d at 568.

### 2. Prejudice

Defendant was deprived of his liberty for almost sixteen months immediately prior to his indictment. He may, however, have faced that same period of incarceration as a consequence of his violation of the conditions of his parole. Also, there is no substantial claim of other prejudice to Defendant. Defendant's perfunctory assertion that he suffered concern and anxiety as a result of the delay does not establish that he suffered "undue anxiety and concern." *Id.* at 430, 806 P.2d at 570. Nor has he shown how his defense was adversely affected by the delay. Without any further elaboration, Defendant's brief-in-chief refers to Defendant's assertions that he could not properly and effectively investigate the facts of his case, could not travel to California and Mexico to interview witnesses, tried unsuccessfully to contact an investigator in California who had helpful evidence, was without funds to hire an investigator, was unable to obtain previously available evidence, and knew neighbors in Mexico who could be witnesses regarding the events of his abduction in Mexico (which presumably would be relevant to the personal-jurisdiction issue discussed above). Defendant also relies on a presumption of prejudice. *See Salandre*. The weight of the presumption, however, depends on the circumstances of the specific case. *Id.* at 429, 806 P.2d at 569. Here, the failure of Defendant to even suggest the nature of the evidence or testimony that would be helpful to his defense, the evidence that Defendant learned of the charges against him shortly after the escape, and the nature of the proof of the charges against him all support the district court's finding that Defendant had not suffered prejudice to the preparation of his defense.

### 3. Reason for the Delay

Defendant points out that there was no particular reason offered for why the State could not have indicted Defendant long before February 1988. But the constitutional right at issue is a right to a speedy *trial*, not a speedy *indictment*. The delay in the indictment is relevant here only insofar as that delay caused a delay in Defendant's trial. We note that Defendant was indicted less than ten days after he was returned to New Mexico in February 1988. Defendant does not explain how any substantial delay to his trial was caused by failure to indict him prior to his return to New Mexico.

We thus focus on the reasons for the delay in returning Defendant to New Mexico. The delay from January 1985 until his arrest in Mexico on October 17, 1986, resulted from Defendant's departure from New Mexico to California and Mexico. Once in California custody in late 1986, Defendant initially fought his return to New Mexico for trial. At a municipal court proceeding on November 13, 1986, he objected to extradition and sought to be released on a writ of habeas corpus. Defendant exhausted all attempts at this remedy by the end of 1986. The delay thereafter

apparently resulted from the desire of an attorney in California to have Defendant available to testify in a California trial.

### 4. Assertion of the Right

As opposed to demanding a speedy trial, Defendant endeavored to delay his trial. At the time of the escape on January 7, 1985, Defendant's parole officer had granted him permission to travel to California through January 10. The district court could properly infer that Defendant had fled New Mexico specifically to avoid trial for his involvement in the escape. This flight and Defendant's petition for release from custody in California clearly establish his attitude through 1986. From the record below, the district court could also have properly concluded that Defendant wished to remain in California custody after the denial of his petition for a writ of habeas corpus.

In addition, the district court could properly find that Defendant never requested a trial prior to his indictment in New Mexico. At the second hearing on Defendant's motion to dismiss, Defendant presented evidence that he had arranged for his mother to mail a letter to the New Mexico district attorney requesting a trial. The district court, however, stated that the letter was merely "a sham." We note that Defendant admitted that he was represented by counsel during his entire stay in California; he therefore could easily have made a demand for trial through more formal channels than his mother.

### 5. Weighing the Factors

Although there was a lengthy delay, Defendant's conduct indicates that the delay did not displease him. As noted in *Barker*, 407 U.S. at 521, 92 S.Ct. at 2187: "[D]eprivation of the right may work to the accused's advantage. Delay is not an uncommon defense tactic." Defendant did not seek a speedier resolution of the charges against him, the delay did not prejudice his defense, and we cannot attribute any of the delay to misconduct, intentional or otherwise, by the State. We conclude that De-

fendant was not denied his right to a speedy trial by pre-indictment delay.

### 6. Due Process

We can now summarily dispose of Defendant's due process claim. To prevail on a claim that delay in the proceedings violated Defendant's right to due process, Defendant must prove prejudice and an intentional delay by the State to gain a tactical advantage." *Gonzales v. State*, 111 N.M. 363, 365, 805 P.2d 630, 632 (1991). "[T]he presence of prejudice is dependent upon the adverse effect delay has had on the merits of the defendant's case in light of all the circumstances." *Id.* The prejudice must be both "actual" and "substantial." To be "actual" prejudice, the prejudice must be established with some definiteness; proof cannot be mere conjecture or speculation. *See id.* To be "substantial," the prejudice must be more than nominal—it must have impacted the defense. *See id.*

As indicated by our discussion of Defendant's speedy trial claim, Defendant has failed to establish the requisite intent by the State and the requisite actual and substantial prejudice. Therefore, we reject Defendant's claim that his right to due process was violated by the delay in this case.

## V. HABITUAL OFFENDER SENTENCING

Defendant claims that there was insufficient proof that he was the same person convicted of the felonies used to enhance his sentence. Although Defendant points to a discrepancy with respect to social security numbers, the evidence was sufficient to support the district court's determination. As for Defendant's claim that inadmissible hearsay was received in evidence at the habitual offender proceeding, we reject the contention because Defendant has failed to specify what the inadmissible evidence was. *See State v. Hernandez*, 104 N.M. 268, 274, 720 P.2d 303, 309 (Ct.App.1986) (contention on appeal is deemed abandoned if appellant fails to explain the claim).

## VI. CUMULATIVE ERROR

Defendant also claims cumulative error. Having found only one error, which was harmless, we hold that the doctrine of cumulative error has no application. *See State v. Taylor,* 104 N.M. 88, 96, 717 P.2d 64, 72 (Ct.App.1986); *United States v. Rivera,* 900 F.2d at 1469–72.

## VII. INEFFECTIVE ASSISTANCE OF COUNSEL

In support of his contention that he was denied effective assistance of counsel at trial, Defendant refers to the amendment to his docketing statement. This is not an acceptable briefing practice. *See State v. Aragon,* 109 N.M. 632, 634, 788 P.2d 932, 934 (Ct.App.1990). To the extent that Defendant relies on the amendment to the docketing statement, this claim is therefore deemed abandoned. *Id.* We have reviewed Defendant's contentions and find no support for the claim of ineffective assistance.

## VIII. CONCLUSION

For the above reasons we affirm Defendant's convictions and sentences.

IT IS SO ORDERED.

MINZNER and FLORES, JJ., concur.