11 P.3d 131

2000-NMSC-028

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Rudy Anthony GONZALES, Jr.,
Defendant–Appellant.**

**No. 24,724.**

Supreme Court of New Mexico.

Aug. 9, 2000.

Marc H. Robert, P.C., Marc H. Robert, Albuquerque, NM for Appellant.

Patricia A. Madrid, Attorney General, Max Shepherd, Assistant Attorney General, Santa Fe, NM for Appellee.

*OPINION*

SERNA, Justice.

{1} Defendant Rudy Gonzales Jr. appeals his convictions of first degree deliberate intent murder, conspiracy to commit murder, and tampering with evidence. On appeal, Defendant argues eight separate grounds for reversal: (1) the trial court improperly admitted the State's polygraph evidence because the State did not provide the requisite notice to Defendant under our Rules of Evidence; (2) the trial court erred in denying Defendant's motions for a mistrial after the State presented testimony of two of Defendant's prior bad acts; (3) defects in the audiotape recording of the trial deprived Defendant of a meaningful right to appeal his convictions in violation of his right to due process; (4) the jury's verdict was a product of intimidation from extraneous information; (5) the State violated the rules of discovery by failing to disclose the polygraph evidence; (6) Defendant received ineffective assistance of counsel at trial; (7) prosecutorial misconduct violated Defendant's right to a fair trial; and (8) there was insufficient evidence to support Defendant's convictions. Defendant finally claims, as an alternative to reversal on any single ground, that the cumulative errors of the trial court deprived him of a fair trial and mandate reversal of his convictions.

{2} We address in this opinion Defendant's first two points of error only. We have thoroughly examined the facts and law applicable to Defendant's remaining claims and summarily conclude that they are without merit. With respect to Defendant's claim concerning the admission of polygraph evidence, we conclude that the trial court did not abuse its discretion in determining that Defendant had an adequate opportunity to prepare rebuttal to the polygraph evidence and suffered no prejudice from the State's late disclosure of the evidence. With respect to the prior bad acts, we conclude that the trial court properly cured any harm from the inadvertent presentation of one prior bad act with an admonition to the jury not to consid-

er the evidence, and we conclude that the testimony concerning Defendant's other prior bad act amounts to harmless error. The minor errors committed in the course of the trial did not deprive Defendant of a fair trial, and we therefore decline to apply the doctrine of cumulative error. We affirm Defendant's convictions.

## I. Facts

{3} On June 24, 1993, Gerald Chavez called the police to report his girlfriend, Lisa Duncan, missing. After arriving at Ms. Duncan's house and inspecting the scene, the police determined that criminal activity had likely taken place. The police then interviewed Mr. Chavez on several occasions about his relationship with Ms. Duncan and the circumstances surrounding his discovery that Ms. Duncan was missing. Mr. Chavez was initially reluctant to disclose the nature of his relationship with Ms. Duncan because he was married, and the police initially considered him to be a suspect in her disappearance, though not high on a list of suspects.

{4} The police also spoke to Ms. Duncan's ex-husband, Donald Duncan. Mr. Duncan initially emerged as the most obvious suspect. Mr. Duncan had been convicted in 1985 of six counts of criminal sexual penetration and incest in relation to incidents involving his step-daughter, Heidi Rodriguez, and a daughter from a previous marriage. Ms. Duncan testified against Mr. Duncan at his trial. After Mr. Duncan served approximately eight years of his sentence for these crimes, the district court granted Mr. Duncan habeas corpus relief on the ground of ineffective assistance of counsel, which this Court affirmed, see Duncan v. Kerby, 115 N.M. 344, 851 P.2d 466 (1993). The State subsequently entered a nolle prosequi on the indictments against Mr. Duncan.

{5} After his release from prison in April of 1993, Mr. Duncan had contact with Ms. Duncan on several occasions. The police learned that the two had at least one argument in the months immediately preceding Ms. Duncan's disappearance. As a result, the police devoted a considerable amount of time during their initial investigation on Mr. Duncan.

{6} The police also attempted to speak to Heidi Rodriguez, Ms. Duncan's daughter. At the time, Ms. Rodriguez had a relationship with Defendant, and she was living with Defendant and his family, including his father, Rudy Gonzales Sr., at their home in Bernalillo, New Mexico. Although the police were able to interview Ms. Rodriguez once at the Gonzaleses' house, police detectives faced some difficulty speaking to Ms. Rodriguez because they were frequently intercepted by Defendant's father. Rudy Gonzales Sr. told the police that he had formerly been in law enforcement and that he wanted to know why the police were interested in speaking to Ms. Rodriguez.

{7} At Ms. Duncan's house, the police had discovered a handcuff key in a hallway. In addition, the police determined Ms. Duncan's house to be an organized crime scene, which indicated to police a likelihood that the crime was planned and that the perpetrator knew the victim. Because of these facts, the police became suspicious of Rudy Gonzales Sr. due to his past experience in law enforcement. The police also suspected that Ms. Rodriguez might have some knowledge about the crime due to her relationship with Rudy Gonzales Sr.

{8} As a result of suspicions about Mr. Chavez, Mr. Duncan, and Ms. Rodriguez, the police requested that each of them take a polygraph examination, to which they all agreed. Additionally, the police surmised the approximate time of the suspected crime from the time Ms. Duncan left her place of employment and from a store receipt found in her car that listed the time of purchase as 10:12 p.m. on June 21, 1993. The police investigated the whereabouts of Mr. Chavez and Mr. Duncan during the approximate time that Ms. Duncan disappeared. The police concluded that, although Mr. Duncan had the most obvious motive to harm Ms. Duncan, he did not have the opportunity to commit the crime. Similarly, the police determined that Mr. Chavez did not have the opportunity to commit the crime. During the interview process, the police determined from an investigatory standpoint that Mr. Duncan's personality-type was probably more likely to result in a disorganized, or violent, crime scene

rather than the organized crime scene found at Ms. Duncan's house. The police also believed that Mr. Duncan was the least likely of the suspects to have had handcuffs. As a result of the interviews, the polygraph tests, and other aspects of the investigation, the police compiled a preliminary list of suspects, with Rudy Gonzales Sr. as the primary suspect, followed by Mr. Chavez and then Mr. Duncan.

{9} The police located Ms. Duncan's body on September 30, 1993, buried underneath a piece of concrete in a shallow grave in a remote area of Sandoval County. Her hands were handcuffed behind her back, several of her bones were broken, and her head was severed from the rest of the body. The medical investigator determined that the cause of death was a single gunshot to the head.

{10} After finding Ms. Duncan's body, the police continued with their investigation. However, the police were unable to make any substantial progress, and the investigation was essentially stagnant until September of 1996. At that time, the police learned from Leroy Gutierrez's mother that Leroy, who was a friend of Defendant and his father, was having nightmares and making references to a killing in his sleep, such as, "Why did they choke her?" The police then interviewed Leroy Gutierrez. As a result of the interview, the police arrested Defendant and Rudy Gonzales Sr. and searched the Gonzales home.

{11} Leroy Gutierrez, who had been fifteen years old at the time of Ms. Duncan's disappearance and was eighteen years old at the time of Defendant's trial, testified against Defendant. Leroy explained that he lived near the Gonzaleses and had spent a great deal of time at their house from age eleven. He testified about two incidents between Ms. Duncan and the Gonzaleses leading up to Ms. Duncan's disappearance. During the first incident, Ms. Duncan arrived at the Gonzales home with a police officer. She was visibly very upset and wanted to speak to Defendant and her daughter because she believed they had stolen a ring from her. Although Ms. Duncan did not find Heidi Rodriguez or Defendant at that time, Leroy testified that they were both inside the Gonzales home. Heidi Rodriguez also testified at Defendant's trial and related a similar version of this incident.

{12} The second incident also involved Ms. Duncan's stolen ring. According to Leroy, he drove Rudy Gonzales Sr. and Ms. Rodriguez to a jewelry store in Albuquerque to meet Ms. Duncan approximately two weeks before her disappearance. Rudy Gonzales Sr. gave Leroy a gun and told him to pull out the gun and start shooting if he saw Rudy Gonzales Sr. signal him. Rudy Gonzales Sr. then went into the jewelry store to meet Ms. Duncan while Leroy and Heidi Rodriguez stayed outside in Rudy Gonzales Sr.'s truck. After a few minutes, Ms. Duncan exited the store with Donald Duncan, and an argument ensued between Mr. Duncan and Rudy Gonzales Sr. After Leroy saw Rudy Gonzales Sr. signal him, he got out of the truck and gave the gun to Rudy Gonzales Sr., but they left shortly afterward without further incident. Heidi Rodriguez and Donald Duncan gave similar testimony about the incident at the jewelry store. According to Mr. Duncan, Rudy Gonzales Sr. told Ms. Duncan that he would return her ring only if she paid him, so Ms. Duncan asked Mr. Duncan to accompany her to the jewelry store to ensure that he returned her ring. Mr. Duncan testified that Rudy Gonzales Sr. grabbed Ms. Duncan in the jewelry store and demanded payment for the ring, so Mr. Duncan interceded and forced Rudy Gonzales Sr. to leave.

{13} Approximately two weeks after the incident at the jewelry store, Rudy Gonzales Sr. and Defendant told Leroy to drive them to Ms. Duncan's house to discuss the ring. At Ms. Duncan's house, Defendant and his father went inside, and Defendant told Leroy to back the truck into the driveway when he whistled to him. Leroy later saw Ms. Duncan drive up to her house and go inside, and he then heard a commotion in the house. After a few minutes, Defendant whistled to Leroy, and after pulling into the driveway and exiting the truck, Leroy saw Ms. Duncan on the ground. She had blood on her mouth and nose, and because she was not moving, Leroy believed that she was dead. Rudy Gonzales Sr. then handcuffed her hands be-

hind her back, during which Leroy heard a breath from Ms. Duncan, and told Leroy that "this is what happens to rats." Leroy testified that both Defendant and Rudy Gonzales Sr. told him not to tell anyone about this or something similar would happen to him. Leroy testified that Defendant and his father rolled Ms. Duncan in a piece of carpet and placed her in the truck.

{14} Rudy Gonzales Sr. then instructed Leroy to drive back to Bernalillo and gave him directions to a dirt road. Leroy waited in the truck while Defendant and his father dragged Ms. Duncan away from the road. After about twenty minutes, Leroy heard a gunshot. Leroy testified that Defendant later told him that he and his father had returned to the dirt road the following day to bury the body more thoroughly.

{15} Michael Cosentino and Bill Woolstenhulme also testified about statements made to them by Defendant. Mr. Cosentino was a close friend of Defendant's for ten years, and he testified that Defendant told him that his father had choked Ms. Duncan in her house until she lost consciousness. Defendant told Cosentino that they wrapped her in carpet, put her in their truck, and took Ms. Duncan out of town. Defendant put a pistol to her head and shot her. Defendant also told Cosentino that Ms. Duncan had begged for her life before he shot her. Bill Woolstenhulme, who had numerous prior felony convictions and had previously served as an informant, met Defendant in jail. Woolstenhulme testified that Defendant told him that Ms. Duncan was threatening to press charges for the theft of her ring, and Defendant then related a story similar to the one Defendant told Cosentino, omitting the detail of who pulled the trigger.

{16} The State also introduced physical evidence linking Defendant and his father to the murder. The State introduced Ms. Duncan's .22 caliber pistol and a newspaper article concerning her disappearance, both of which were found in a box in Rudy Gonzales Sr.'s bedroom closet. Additionally, the State introduced two empty handcuff cases found in the same closet.

{17} The jury returned guilty verdicts on the charges of willful and deliberate first degree murder, conspiracy to commit murder, and tampering with evidence. The trial court sentenced Defendant to life imprisonment for first degree murder to run consecutively with nine years imprisonment for conspiracy to commit murder, and eighteen months for tampering with evidence to run concurrently with the sentence for conspiracy.

## II. Polygraph Evidence

{18} On appeal, Defendant first argues that the trial court erred in admitting the State's polygraph evidence due to the State's failure to provide adequate notice of the polygraph examiner's testimony. The trial in this case began on April 9, 1997. At a hearing on March 17, 1997, the State informed Defendant for the first time of its intent to use as evidence the polygraph results from the tests performed on Mr. Chavez, Mr. Duncan, and Ms. Rodriguez in 1993. The State then filed an amended witness list on March 20, 1997, that included the polygraph examiner, Ralph Costain. The State did not provide Defendant with a copy of the polygraph examiner's report, a copy of his charts, and a copy of his audio recordings of the testing until March 31, 1997. Defendant then filed a motion to exclude the evidence because the State did not comply with the notice requirements of Rule 11–707(D) NMRA 2000.

{19} The trial court determined that the State violated Rule 11–707(D) and granted Defendant's motion to exclude. However, the trial court made the ruling conditional; if Defendant attempted to show that Mr. Duncan killed Ms. Duncan, then the State would be permitted to introduce the polygraph evidence relating only to Mr. Duncan in rebuttal. At trial, one of Defendant's primary avenues of defense was to argue that Mr. Duncan committed the crime. During opening statements, defense counsel told the jury that Mr. Duncan was the primary suspect in the case and insinuated that Mr. Duncan was the only individual who would have been angry enough at Ms. Duncan to commit such a heinous crime. As a result, the trial court allowed the State, after Mr. Duncan testified but still in its case in chief, to call the polygraph examiner to the stand to testify about

Mr. Duncan's polygraph results. Mr. Costain testified that the results of the polygraph test indicated that Mr. Duncan was being truthful when he denied involvement in Ms. Duncan's disappearance.

{20} Defendant argues that the trial court erred in admitting the polygraph evidence. We disagree. Our Rules of Evidence require that a

> party who intends to use polygraph evidence at trial, shall not less than thirty (30) days before trial or such other time as the district court may direct, serve upon the opposing party a written notice of such party's intention to use such evidence. The following reports shall be served with the notice: (1) a copy of the polygraph examiner's report, if any; (2) a copy of each chart; (3) a copy of the audio or video recording of the pretest interview, actual testing and posttest interview; and (4) a list of any prior polygraph examinations taken by the examinee in the matter under question. . . .

Rule 11–707(D).

{21} Rule 11–707(D) thus imposes a notice requirement of thirty days as a condition for admitting polygraph evidence. It is clear from the plain language of Rule 11–707(D), however, that it does not establish a rigid thirty-day notice requirement. The rule, by providing that notice may be given at "such other time as the district court may direct," confers some discretion on trial court judges to determine whether a different notice requirement, either longer or shorter than thirty days, is appropriate for a particular case. "The purpose of [Rule 11–707(D)] . . . is to prevent surprise and to give the opposing party an opportunity to collect rebuttal evidence." *State v. Baca*, 120 N.M. 383, 388, 902 P.2d 65, 70 (1995). In evaluating the issue of adequate notice under Rule 11–707(D), then, trial courts must seek to effectuate these purposes. Thus, the rule provides trial courts with the guideline that, in a typical case, an opposing party should be given notice at least thirty days before trial in order to prevent unfair surprise and to ensure adequate opportunity to prepare rebuttal.

{22} In *Baca*, for example, this Court considered a trial court's exclusion of evidence offered by the defendant that a State's witness failed a polygraph exam based on the defendant's failure to comply with the notice requirements of Rule 11–707(D). 120 N.M. at 387–88, 902 P.2d at 69–70. We first noted in *Baca* that "[a]dherence to the procedural rules for proffering evidence provides the best opportunity for a fair trial, and, unless justice and fairness are shown to dictate otherwise, we will uphold the exclusion of polygraph results when a party does not follow these rules." *Id.* at 388, 902 P.2d at 70. We also admonished the defendant for failing to comply with the notice requirements of Rule 11–707(D). *Id.* However, because the State had administered the polygraph test in the first instance, we determined that "the State cannot argue that it was surprised by Baca's attempt to introduce the test results." *Id.* Additionally, the State was aware of the results of the exam and the method of testing and had the option of conducting another exam if it was unsatisfied with the results of the first exam. *Id.* As a result, we determined that, despite the defendant's technical violation of the notice requirements of Rule 11–707(D), "the purposes of [the rule] would not be subverted by the admission of the polygraph results in this case," and the trial court therefore erred in excluding the evidence. *Id.*

{23} As our discussion of the issue in *Baca* indicates, the notice requirement of Rule 11–707(D) may be applied in a flexible manner based on the purposes of the rule. Further, "[w]e review the admission of evidence under an abuse of discretion standard and will not reverse in the absence of a clear abuse." *State v. Sarracino*, 1998–NMSC–022, ¶ 20, 125 N.M. 511, 964 P.2d 72. With these principles in mind, we turn to the trial court's ruling in this case.

{24} At a hearing on Defendant's motion to exclude the polygraph evidence held on the day before trial, the State argued that Defendant received constructive notice of the intent to use the polygraph evidence long before trial because, during discovery, the State provided Defendant with the polygraph

results and the questions asked during the examination. The State also attempted to excuse its late disclosure by arguing that, due to the multiple law enforcement agencies involved in the case and the different phases of the case during the long period of time since Ms. Duncan's disappearance, the prosecutors were unable to obtain the charts and tapes from the polygraph examinations until March 31, 1997, and they immediately provided copies to Defendant. The State argued that the notice of intent to use the polygraph evidence on March 17, 1997, coupled with the disclosure of the charts and tapes ten days prior to trial, prevented any unfair surprise and provided Defendant an adequate opportunity to collect rebuttal evidence. Defense counsel contended that the late disclosure prejudiced his ability to prepare for a pretrial interview with the State's expert and argued that it would be impossible to obtain another expert to review the results of the examination. The trial court granted Defendant's motion to exclude the polygraph evidence, denied the State's alternative request for a continuance, and denied the State's request for an interlocutory appeal on the issue.

{25} The following day, the trial court considered the State's motion in limine to prevent Defendant from introducing evidence of Donald Duncan's 1985 conviction. Defense counsel indicated that he intended to use the evidence to demonstrate that Donald Duncan had a motive to kill Ms. Duncan. The State argued, under Rule 11–403 NMRA 2000, that the prejudicial effect of the evidence substantially outweighed its probative value because Ms. Duncan had later recanted her testimony against Mr. Duncan, a police investigation had cleared Mr. Duncan of Ms. Duncan's murder, and any inference of motive would be purely speculative. The trial court permitted Defendant to introduce the evidence of the charges against Mr. Duncan and Ms. Duncan's testimony against him. However, the trial court informed the State that it would be permitted to attack Defendant's theory about Mr. Duncan on rebuttal and that the State's rebuttal could include the polygraph evidence relating to Mr. Duncan. The trial court stated that the notice requirements of Rule 11–707(D) applied only to introduction of the evidence in the State's case in chief and did not apply to rebuttal. The trial court advised counsel that it would consider allowing the polygraph evidence in the State's case in chief if Defendant "opened the door" to the use of the polygraph evidence early in the trial.

{26} We first address the trial court's interpretation of Rule 11–707(D) concerning rebuttal and the trial court's conditional ruling that the evidence would be admissible to rebut Defendant's theory about Mr. Duncan. We believe that the trial court improperly discouraged Defendant's pursuit of a primary defense theory based on the State's violation of the rules. The trial court's ruling placed Defendant in the awkward position of choosing between a viable defense theory or the admission of otherwise inadmissible evidence. We cannot sanction this aspect of the trial court's ruling. Once the trial court determined that the State failed to comply with Rule 11–707(D), without determining that the circumstances in the case warranted a departure from the presumptive notice requirement of thirty days, the trial court erred in making its ruling conditional on Defendant's attempt to implicate Mr. Duncan in the crime.

{27} We also believe the trial court misconstrued the scope of the notice requirement for polygraph evidence. Rule 11–707(D) does not provide an exception to the notice requirement for rebuttal evidence. A party must comply with the notice requirement regardless of the purpose for which the evidence is to be used. Indeed, it is implicit in the very nature of polygraph evidence that it will be relevant only to bolster testimony that an opposing party has attempted to impeach through cross-examination. *See* Rule 11–707(C) (providing that, subject to specific conditions, a polygraph examiner's opinion may "be admitted as evidence as to the truthfulness of any person called as a witness"). Thus, it would frustrate the purposes of the notice requirement in Rule 11–707(D) to create an exception for rebuttal polygraph testimony. We now expressly direct trial courts not to consider an opponent's theory at trial or a proponent's limited rebut-

tal use for purposes of evaluating whether a proponent of polygraph evidence has adequately complied with the notice requirement of Rule 11–707(D).

{28} In this case, the trial court improperly conditioned the exclusion of evidence on Defendant's theory at trial. We therefore agree with Defendant that the trial court erred in this aspect of its initial ruling. If the trial court's decision to admit the polygraph evidence had been based solely on its initial conditional ruling concerning the rebuttal use of the evidence, we would agree with Defendant that the trial court erred in admitting the evidence. However, the record demonstrates that the trial court did not rely solely on the rebuttal use of the testimony; instead, the trial court's later ruling admitting the evidence properly focused on the purposes of Rule 11–707(D) and the analysis articulated by this Court in *Baca*.

{29} On the first day of the trial, the State requested that the trial court allow the polygraph evidence based on Defendant's opening statement suggesting that Mr. Duncan committed the crime. The trial court deferred its ruling at that time. On the second day of the trial, the trial court revisited the admissibility of the polygraph evidence. The trial court did not simply rely on its earlier conditional ruling; the trial court instead expressly indicated that it would reconsider its earlier ruling excluding the polygraph evidence. The trial court noted that Defendant had first been given notice of the State's intent to use the polygraph evidence on March 17, 1997, thereby eliminating any undue surprise related to the polygraph testimony. Additionally, the trial court asked the State whether it intended to present the polygraph evidence earlier or later in the trial. After the State indicated that it would not call the polygraph examiner until the following week, the trial court told defense counsel that there should be sufficient time to have an expert review the charts and tapes. Finally, the trial court noted that Defendant had "opened the door" by naming Mr. Duncan as a suspect. The trial court concluded that Defendant would not be prejudiced by admission of the evidence because there had been sufficient time to prepare

rebuttal and noted that if the State had intended to call the expert polygraph examiner earlier in the trial, then, due to the lesser amount of time available to Defendant to prepare rebuttal, the ruling would have been different.

■ {30} Consistent with our interpretation of Rule 11–707(D), we cannot condone the trial court's reliance on Defendant "opening the door" for the admission of the polygraph evidence. Defendant's theory at trial and the relative probative value of the State's polygraph evidence are irrelevant under Rule 11–707(D); factors of this nature are more appropriately considered in balancing the danger of unfair prejudice and probative value under Rule 11–403. However, this consideration was merely one factor in the trial court's analysis. As stated above, the purposes of Rule 11–707(D) are to prevent unfair surprise and to ensure an adequate opportunity to prepare rebuttal. The trial court determined that both of these purposes were satisfied in this case. Defendant initially received notice of the State's intention to use the polygraph evidence on March 17, 1997, and Mr. Costain did not testify until April 16, 1997. Additionally, the trial court specifically found that Defendant had an adequate opportunity to prepare rebuttal in this case. This finding is supported by the record. Defense counsel thoroughly cross-examined Mr. Costain about the basis for his conclusions. In fact, at a hearing on Defendant's motion for a new trial, the trial court explicitly noted the effectiveness of defense counsel's cross-examination and found that the cross-examination essentially negated the expert's testimony.

■ {31} Under these circumstances, we do not believe that the trial court's erroneous consideration of the rebuttal use of the evidence constitutes an abuse of discretion. The limited question we must address on appeal is whether the trial court's decision to admit the polygraph evidence "is clearly against the logic and effect of the facts and circumstances of the case," *State v. Simonson*, 100 N.M. 297, 301, 669 P.2d 1092, 1096 (1983), or can otherwise be characterized "as clearly untenable or not justified by reason." *State v. Litteral*, 110 N.M. 138, 141, 793 P.2d

268, 271 (1990). Because the trial court's ruling was properly founded on the purposes of Rule 11–707(D) and because Defendant suffered no undue surprise or prejudice from the admission of the polygraph evidence, we do not believe that the trial court abused its discretion in admitting the evidence regardless of the rebuttal purpose of the evidence.

{32} In any event, even if the trial court's decision to admit the polygraph testimony had been erroneous, the error would have been harmless. In order to warrant reversal, the erroneous admission of evidence must cause prejudice to a defendant. *See* Rule 11–103(A) NMRA 2000 ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected...."). In determining whether a particular error committed by the trial court is harmless, we apply a three-part test: (1) the conviction must be supported by substantial evidence without reference to the improperly admitted evidence; (2) there must be such a disproportionate amount of permissible evidence against the defendant that the improperly admitted evidence appears minuscule in comparison; and (3) there was no substantial conflicting evidence to discredit the permissible evidence introduced by the State. *State v. Moore*, 94 N.M. 503, 504, 612 P.2d 1314, 1315 (1980). We utilize this three-part test to assess the more general question of whether "there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Clark v. State*, 112 N.M. 485, 487, 816 P.2d 1107, 1109 (1991).

{33} As listed in detail above, there is clearly substantial evidence supporting Defendant's convictions without the polygraph evidence. In addition, we believe that the evidence of the polygraph testimony was minute in comparison to the permissible evidence supporting Defendant's guilt. The only purpose of the polygraph evidence was to bolster Mr. Duncan's denial of involvement in Ms. Duncan's disappearance. However, the State introduced other evidence that supported Mr. Duncan's denial, including testimony from a police detective that, based on extensive investigation of Mr. Duncan's whereabouts at the time of the crime, he did not have the opportunity to commit the murder. More importantly, there was overwhelming evidence of Defendant's guilt independent of Mr. Duncan's credibility. Finally, Defendant did not introduce substantial conflicting evidence discrediting the permissible evidence introduced by the State.

{34} We determine that there is no reasonable possibility that the results of Mr. Duncan's polygraph examination contributed to Defendant's convictions. As a result, we conclude that any possible error in the admission of this evidence would have been harmless and therefore would not warrant reversal.

### III. Prior Bad Acts

{35} Defendant contends that the trial court erred by denying two of Defendant's motions for a mistrial following the separate improper introduction of two of Defendant's prior bad acts. We review a trial court's denial of a motion for mistrial under an abuse of discretion standard. *State v. Saavedra*, 103 N.M. 282, 284, 705 P.2d 1133, 1135 (1985).

{36} Defendant first argues that the trial court should have granted his motion for a mistrial after Mr. Woolstenhulme inadvertently testified that Defendant told him he was incarcerated on a bomb charge. Defendant immediately objected to this testimony and moved for a mistrial. *See* Rule 11–404(B) NMRA 2000 ("Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith."); *see also Saavedra*, 103 N.M. at 284, 705 P.2d at 1135 ("The case law in New Mexico is clear and consistent in holding that erroneous admission of evidence of prior crimes of the accused is error, absent special circumstances."). The trial court sustained Defendant's objection but denied Defendant's motion for a mistrial. With defense counsel's agreement, the trial court instructed the jury not to consider the testimony.

{37} "The overwhelming New Mexico case law states that the prompt sustaining of the objection and an admonition to disregard the answer cures any prejudicial effect of

inadmissible testimony." *Simonson,* 100 N.M. at 301, 669 P.2d at 1096; *accord State v. Vialpando,* 93 N.M. 289, 296–97, 599 P.2d 1086, 1093–94 (Ct.App.1979) ("New Mexico has frequently held that a prompt admonition from the court to the jury to disregard and not consider inadmissible evidence sufficiently cures any prejudicial effect which otherwise might result."); *see State v. Foster,* 1998–NMCA–163, ¶ 24, 126 N.M. 177, 967 P.2d 852, *cert. denied,* 126 N.M. 533, 972 P.2d 352 (1998). We conclude that the trial court's curative instruction minimized any prejudice from the witness's inadvertent remark. Thus, the trial court did not abuse its discretion in denying Defendant's motion for a mistrial. *Cf. State v. McDonald,* 1998–NMSC–034, ¶ 28, 126 N.M. 44, 966 P.2d 752.

{38} Defendant's second motion for a mistrial, however, presents a more difficult question. Defendant contends that the State intentionally elicited inadmissible prior-bad-act testimony from Heidi Rodriguez. On redirect examination, the State asked Ms. Rodriguez if she was afraid of Defendant and why she was afraid. Defense counsel objected to the question, but the trial court overruled the objection. Ms. Rodriguez then testified that she and Defendant "used to fight and he'd throw me around." Defense counsel again objected and argued that the prosecutor intentionally sought to introduce character evidence showing a violent character. The trial court sustained the second objection but denied Defendant's motion for a mistrial. Defendant did not request an admonishing instruction, and the trial court did not give one.

{39} We have previously distinguished between inadvertent remarks made by a witness about a defendant's inadmissible prior crime or wrong and similar testimony intentionally elicited by the prosecutor. *See Saavedra,* 103 N.M. at 284–85, 705 P.2d at 1135–36; *State v. Rowell,* 77 N.M. 124, 125–29, 419 P.2d 966, 967–70 (1966); *see also Simonson,* 100 N.M. at 301, 669 P.2d at 1096 (distinguishing cases in which a prosecutor deliberately asks a question in order to elicit improper evidence); *State v. Ferguson,* 77 N.M. 441, 445, 423 P.2d 872, 875 (1967) (same). We apply a different analysis to inadmissible testimony intentionally elicited by the prosecution. Specifically, regardless of whether a trial court admonishes the jury not to consider the testimony, we must determine whether there is a reasonable probability that the improperly admitted evidence could have induced the jury's verdict. *See Saavedra,* 103 N.M. at 285, 705 P.2d at 1136; *Vialpando,* 93 N.M. at 297, 599 P.2d at 1094; *cf. Clark,* 112 N.M. at 487, 816 P.2d at 1109.

{40} The State does not contend on appeal that Ms. Rodriguez's remark was inadvertent or that the prosecutor did not intentionally seek to elicit inadmissible testimony. We also note that the trial court did not attempt to mitigate any possible prejudice by offering to instruct the jury not to consider the testimony. Nonetheless, we believe that other mitigating factors are present in this case which adequately ensure that there is no reasonable probability that the improper testimony from Ms. Rodriguez contributed to the jury's verdict. *Cf. State v. Gibson,* 113 N.M. 547, 556, 828 P.2d 980, 989 (Ct.App. 1992) (discussing mitigating factors).

{41} First, Ms. Rodriguez's testimony was entirely cumulative of earlier testimony in the trial to which Defendant did not object and was largely cumulative of testimony which the trial court properly allowed over Defendant's objection. During direct examination of the State's first witness, Leroy Gutierrez, the prosecutor, intending to establish that Defendant and Ms. Rodriguez were living together as a couple, asked Leroy to "describe [Ms. Rodriguez's] relationship with [Defendant]." Leroy inadvertently responded that Defendant and Ms. Rodriguez "got in fights" and that Defendant "was abusive." Defendant did not object to this testimony. During direct examination of Ms. Rodriguez, the State asked about an incident between Defendant, Ms. Rodriguez, and Ms. Duncan that had occurred at Ms. Duncan's house. Ms. Rodriguez testified that Defendant was angry, pushed Ms. Rodriguez, pushed Ms. Duncan, and broke some plates. After Ms. Duncan went into her bedroom to call the police, Defendant unsuccessfully attempted to push her bedroom door open. Although Defendant objected to this testimony as improper evidence of character, the trial court found that the testimony was relevant to

prove motive and properly concluded that the testimony was admissible under Rule 11–404(B) (providing that evidence of other crimes, wrongs or acts may "be admissible for other [non-character] purposes, such as proof of motive"). Defendant complains of neither of these statements on appeal. Thus, we believe, due to the cumulative nature of the testimony, that Defendant suffered no measurable prejudice from Ms. Rodriguez's remark. *See State v. Woodward,* 121 N.M. 1, 10, 908 P.2d 231, 240 (1995) ("The erroneous admission of cumulative evidence is harmless error because it does not prejudice the defendant."); *cf. Gibson,* 113 N.M. at 556, 828 P.2d at 989 (discussing the "marginal" impact of improper testimony based on other evidence properly admitted at trial).

{42} Additionally, we note that neither the prosecution nor Ms. Rodriguez emphasized the improper testimony. *Cf. McDonald,* 1998–NMSC–034, ¶ 28, 126 N.M. 44, 966 P.2d 752; *Gibson,* 113 N.M. at 556, 828 P.2d at 989. Finally, as demonstrated by the section of this opinion outlining the facts established at trial, we believe that the permissible evidence introduced by the State overwhelmingly supports Defendant's guilt and that the improper testimony by Ms. Rodriguez is minuscule in comparison to the properly admitted evidence. *See Moore,* 94 N.M. at 504, 612 P.2d at 1315 (discussing factors relevant to a harmless error analysis). Thus, we conclude that there is no reasonable probability that the improper testimony contributed to the jury's verdict. "Even if the testimony should not have been admitted, the district court acted well within the bounds of its discretion in determining that the evidence did not so taint the trial as to require a mistrial." *Foster,* 1998–NMCA–163, ¶ 24, 126 N.M. 177, 967 P.2d 852.

## IV. Conclusion

{43} The trial court's decision to admit the polygraph evidence was based on the State satisfying the purposes of Rule 11–707(D), and we therefore conclude that the trial court did not abuse its discretion in admitting the evidence. The trial court adequately cured any prejudice resulting from inadvertent testimony of another crime committed by De-

fendant by admonishing the jury not to consider the testimony. The State improperly intended to elicit testimony of Defendant's other wrong to establish character; however, because the erroneous introduction of this evidence amounts to harmless error, the trial court did not abuse its discretion in denying Defendant's motion for a mistrial.

 {44} Defendant's remaining points of error are without merit. We also conclude that Defendant's claim of cumulative error fails because, "taken together, the cumulative effect of any errors was slight," *Woodward,* 121 N.M. at 12, 908 P.2d at 242, and "the record as a whole demonstrates that [Defendant] received a fair trial." *State v. Martin,* 101 N.M. 595, 601, 686 P.2d 937, 943 (1984). We therefore affirm Defendant's convictions.

{45} **IT IS SO ORDERED.**

MINZNER, C.J., BACA, FRANCHINI, and MAES, JJ., concur.