**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

**v.**                                                                                      **NO. 26,430**

**EUGENE ARAGON,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SAN MIGUEL COUNTY**
**Jay G. Harris, District Judge**

Gary K. King, Attorney General
Santa Fe, NM
Joel Jacobsen, Assistant Attorney General
Albuquerque, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Will O'Connell, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**SUTIN, Chief Judge.**

Defendant Eugene Aragon appeals from his conviction of second degree murder. Defendant appeals based on (1) the denial of his motion to suppress evidence, namely, bloody clothing; (2) the admission into evidence of a vial of Victim's blood

without proper foundation; (3) the admission into evidence of a post-*Miranda* statement; (4) the admission of a hearsay statement of an emergency medical technician (EMT) to a police officer; (5) the district court's refusal to grant directed verdicts of acquittal on various charges; (6) insufficient evidence; and (7) cumulative error. As to Issue (1), we conclude Defendant did not carry his burden to substantiate a reasonable expectation of privacy in the space from which his clothing was taken. As to Issues (2) through (5), we affirm.

**BACKGROUND**

After a day of working and drinking together, Defendant and Victim, Eddie Woods, got into an argument over money. Defendant punched and kicked Victim. At some point, a friend of one of Victim's neighbors found Victim unconscious and called the police. A detective who was at the scene observed "a lot of blood on the floor," and Victim was taken to the hospital. Victim died twelve days later. The cause of death was blunt trauma to the head.

At trial Defendant's brother, Valentin Aragon, testified. He testified that he, Defendant, Victim, and another brother of Defendant and Valentin named Robert Aragon spent the day working on Robert's mobile home. Throughout the day, the men drank a significant amount of beer. After finishing the work at some point in the

2

evening, Defendant, Valentin, and Victim spent some time at Victim's apartment. Victim's apartment did not have electricity. As it got dark outside, it became difficult to see inside the apartment. There was better light across the street at the park, so the men walked to the park. Around this time Valentin left, though he later went back to Victim's apartment.

Defendant testified that, while at the park, he and Victim decided to buy more beer, and that Defendant gave Victim forty dollars to buy beer, cigarettes, and some food. According to Defendant, Victim walked from the park toward the convenience store. Ten to fifteen minutes passed, Victim did not return, and Defendant decided to walk back to Victim's apartment.

Defendant went to Victim's apartment and yelled Victim's name from downstairs. Victim answered, and Defendant went upstairs to Victim's apartment. Defendant did not see any beer. Defendant told Victim that if he did not buy beer, Defendant wanted his money back. Defendant told Victim to pull out his pockets and show Defendant that he did not have Defendant's money. Victim pulled out his front pockets, and Defendant did not see his money. Defendant testified that he then attempted to pat down Victim's back pockets, but Victim shied away from him.

3

Defendant testified that at this point he felt a strike, as though he had been punched in the face around his nose. Defendant testified that he reacted and punched Victim twice. Defendant testified that he also threw a "pushing kick" at Victim. Defendant testified that this is all that happened during the fight, which lasted five seconds, and at this point Valentin walked in. Defendant testified that Valentin got in between him and Victim, who was "half up, half down." Valentin testified that, when he came through the door, Victim was down on one knee and had the other knee up with his foot on the ground. Defendant and Valentin left and walked to Defendant's mother's house, a block and a half away.

Victim's downstairs neighbor, Maria Trujillo, testified. She testified that she got home when it was getting dark, and shortly thereafter she saw Victim and two other men sitting on the porch, one of whom was Defendant. She called a friend, Kamera Dominguez, who eventually came over. Ms. Dominguez then left and came back about thirty to forty-five minutes later.

Ms. Dominguez testified that as she was leaving Ms. Trujillo's apartment Defendant and his brother were standing in front of the door. She testified that Defendant was standing under the porch light and his brother was right below the steps, and she saw blood on both of them and their clothing. Ms. Dominguez testified

4

that she said "excuse me" as she walked by Defendant, he had to move aside in order for her to walk by, she walked to her house two doors down, gathered some personal items, drove to check on her brother, and returned to Ms. Trujillo's apartment. When she arrived back at the apartment, she told Ms. Trujillo that she saw two men on the porch and that they both had blood on them. Ms. Dominguez testified that Ms. Trujillo asked what the men looked like and described the men before Ms. Dominguez could answer. Ms. Trujillo then asked Ms. Dominguez to check on Victim. Ms. Dominguez, along with another neighbor, went up to Victim's apartment with a flashlight and found Victim unconscious and bloody on the floor. Ms. Dominguez testified that there was change, such as pennies, thrown on or around him. She went back to Ms. Trujillo's apartment and called the police.

When police officers arrived to investigate, one of the women told an officer that one of the men who had left the area was Defendant. Officer Donna Chavez testified that she, through dispatch, received a possible address for Defendant, which was his mother's address, and three officers went to the house. The officers knocked on the door, and Defendant opened the door wearing only boxer shorts. Defendant appeared intoxicated, and the officers noticed a bloodstain on Defendant's arm. Officer Chavez asked if she could enter and speak with Defendant's sister and mother,

who were also at the door. The women agreed, and the officer went in and eventually, after Defendant attempted to leave the room to get dressed, asked one or both of the women to get some clothes for Defendant. The officer accompanied the women as they went downstairs to the basement to get the clothes, and on the way she asked them to get the clothes that Defendant had on earlier that day. The women complied. Defendant put on the clothes he had been wearing earlier, and two of the officers testified that they observed blood stains on Defendant's t-shirt. None of the officers observed any visible injuries on Defendant's face.

Officer Steve Encinias testified at a suppression hearing that after Defendant had been advised of his *Miranda* rights, while still at his mother's house, Defendant told Valentin, "No digas nada," while being escorted to a police car. At a later hearing, the defense moved for the exclusion of Defendant's statement to Valentin, but the district court denied the motion. However, Defendant does not point out where in the record this statement was presented to the jury.

At trial, Detective Adrian Crespin testified as to the evidence preserved by the Las Vegas Police Department from different sources in the course of its investigation. One of the pieces of evidence was a vial containing a blood sample taken from Victim by the Office of the Medical Investigator (OMI) in Albuquerque, New Mexico during

6

the autopsy. Dr. Reichard of the OMI testified during a videotaped deposition that a toxicology screen was performed on Victim's blood, without going into detail as to the preparation of a sample for DNA analysis. Also on a videotaped deposition, Thomas Fedor, a forensic DNA analyst with a private laboratory in California, testified that he received a vial of Victim's blood from the OMI to compare with the blood on Defendant's arm and clothing. The district court allowed the introduction of the vial over defense counsel's objection as to a proper foundation for the blood's origin.

Also at trial, Officer Encinias testified that an EMT told him that Victim's pockets were turned inside out. Over defense counsel's objection, the district court allowed the State to introduce the hearsay statement under the present-sense impression exception of Rule 11-803(A) NMRA.

Once the State rested its case, the defense moved for a directed verdict of acquittal. The court denied the motion. After the defense's case and closing arguments, the matter went to the jury. The jury found Defendant guilty of second degree murder.

**DISCUSSION**

Defendant argues that the district court erred by denying his motion to suppress the bloody clothing that was found to contain Victim's blood through DNA analysis, admitting into evidence a sample of Victim's blood without proper foundation, admitting into evidence a post-*Miranda* statement, admitting improper hearsay testimony of an officer that an EMT told him that Victim's pockets were inside out, and refusing to grant directed verdicts of acquittal on various charges. Further, Defendant argued on appeal that there was insufficient evidence to convict him of second degree murder and that cumulative error deprived him of a fair trial. We consider each of Defendant's arguments in turn.

**Motion to Suppress**

Defendant argues that the district court erred by denying his motion to suppress the evidence of Victim's blood found through DNA analysis on Defendant's clothing. In his motion, Defendant argued that the police obtained the bloody clothing through a warrantless search of his home and without anyone's consent. Officer Chavez asked Defendant's sister to get the clothes that Defendant was wearing earlier that day, and Defendant contends that this amounted to an order to get Defendant's clothes and thus was a search without consent.

8

When reviewing a district court's order on a motion to suppress, this Court will review the district court's factual findings deferentially, under a substantial evidence standard. *State v. Neal*, 2007-NMSC-043, ¶ 15, 142 N.M. 176, 164 P.3d 57. "[W]e do not sit as trier of fact, recognizing that the district court has the best vantage from which to resolve questions of fact and to evaluate witness credibility." *Id.*; *State v. Vandenberg*, 2003-NMSC-030, ¶ 18, 134 N.M. 566, 81 P.3d 19. A defendant seeking to suppress evidence "has the burden to come forward with evidence to raise an issue as to an illegal search and seizure." *State v. Ponce*, 2004-NMCA-137, ¶ 7, 136 N.M. 614, 103 P.3d 54. "Ordinarily, the defendant has the burden of showing a reasonable expectation of privacy that was breached by state action." *State v. Rivera*, 2007-NMCA-104, ¶ 17, 142 N.M. 427, 166 P.3d 488, *rev'd on other grounds*, 2008-NMSC-056, 144 N.M. 836, 192 P.3d 1213. Only after the defendant has established "that law enforcement officers have entered the premises of another and conducted a warrantless search and seizure *in an area wherein the defendant has a reasonable expectation of privacy*," does the prosecution have "the burden of coming forward with evidence to show that the search and seizure came within a valid exception to the search warrant requirements imposed by the [New Mexico] and

United States Constitutions." *State v. Wright*, 119 N.M. 559, 562, 893 P.2d 455, 458 (Ct. App. 1995) (emphasis added).

Defendant did not testify at the suppression hearing. Consequently, he did not testify to facts that might show he had an expectation of privacy. Defendant's mother testified that Defendant would stay at her house when he was working in Las Vegas, that he kept some belongings there, and that he received his mail there. Defendant's mother and sister testified that the basement was used as a guestroom, that there was not a lock on the door, and that others stayed there overnight. A witness testified that Defendant's mother told him that Defendant lived in Albuquerque. Valentin was asleep downstairs in a recliner in front of the television when Officer Chavez and Defendant's mother and sister went to the basement to get the clothes. After hearing all the evidence, the district court found that:

> [I]t's [Defendant's] mom's house. The son was in and out of there . . . . I'm not sure whether the brother was in the bedroom or whether he was in another room downstairs, but evidently there wasn't total privacy of [Defendant] in that bedroom because the brother was there also. So there was no lock on the house, there was no lock on the room, other people used the room whenever they needed it.

The court also determined that Defendant's mother consented to the gathering of the clothes. Accordingly, the district court denied Defendant's motion to suppress the bloody clothes.

We conclude that Defendant failed to meet his burden to show a reasonable expectation of privacy in the area where his clothes were retrieved. Defendant's failure to show that he had a Fourth Amendment expectation of privacy not only curtailed his right to attack the alleged warrantless search, it supported the State's position that he lacked standing to challenge the alleged search based on lack of consent. *See State v. Leyba*, 1997-NMCA-023, ¶ 9, 123 N.M. 159, 935 P.2d 1171 ("[The d]efendant's standing to challenge a search as violative of the Fourth Amendment to the United States Constitution and Article II, Section 10 of the New Mexico Constitution hinges on whether [the defendant] had a reasonable expectation of privacy in the place entered."). Furthermore, there was sufficient evidence for the district court's findings. We affirm the court's denial of Defendant's motion to suppress.

**Admission of Blood Sample**

Defendant next complains that the district court erroneously admitted a sample of blood from Victim. Defendant argues that the State failed to meet the requirements of Rule 11-901(A) NMRA and *State v. Chavez*, 84 N.M. 760, 508 P.2d 30 (Ct. App. 1973), to establish that the evidence had been identified and authenticated. *See* Rule 11-901(A) ("The requirement of authentication or identification as a condition

11

precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."); *Chavez*, 84 N.M. at 761, 508 P.2d at 31 (stating that an item can be identified "by establishing the custody of the object from the time it was seized to the time it is offered in evidence"). Defendant states that no witness testified to drawing the blood and that, therefore, the State failed to establish the chain of custody and failed to prove the evidence was what it purported to be.

We determine that the admission of this evidence, assuming it was erroneous, was harmless.

> In determining whether a particular error committed by the trial court is harmless, we apply a three-part test: (1) the conviction must be supported by substantial evidence without reference to the improperly admitted evidence; (2) there must be such a disproportionate amount of permissible evidence against the defendant that the improperly admitted evidence appears minuscule in comparison; and (3) there was no substantial conflicting evidence to discredit the permissible evidence introduced by the State.

*State v. Gonzales*, 2000-NMSC-028, ¶ 32, 129 N.M. 556, 11 P.3d 131. The test is used to "assess the more general question of whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.* (internal quotation marks and citation omitted). If erroneously admitted evidence does

12

not prejudice a defendant then the admission of the evidence is harmless. *Id.*; *see also* Rule 11-103(A) NMRA ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]").

The blood sample evidence was relevant to establish that Defendant was the one who beat Victim. However there was no dispute that Defendant punched and kicked Victim. Defendant took the stand and testified to this himself. Defendant's defense was not one of mistaken identity, but that of self-defense or a lesser crime than murder. In addition, one witness identified Defendant as someone who was in the area of Victim's apartment within an hour of Victim being found unconscious and at that time was seen in a bloody shirt, while another witness saw Defendant with Victim a few hours before that together on the porch. Defendant's own brother testified that he walked in and saw that Defendant "wasn't happy" and "was a little bit upset," and that Victim had one knee on the ground. Victim's DNA evidence from Defendant's clothing and the blood sample at issue both went only to show something Defendant did not dispute—that Defendant punched and kicked Victim. There is substantial evidence, without the blood sample, that Defendant punched and kicked Victim, that Victim was bloody and lying in blood, that Defendant had Victim's blood on his shirt and a bloodstain on his arm, and that Victim thereafter died from head trauma. The

combination of the witnesses' testimony, along with Defendant's testimony, and other blood and DNA testing, amounts to a "disproportionate amount of permissible evidence against the defendant," such that any improperly admitted evidence would have been "minuscule in comparison." *See Gonzales*, 2000-NMSC-028, ¶ 32. As such, the considerations in *Gonzales* do not prevent a conclusion of harmless error even if there was a search in this case and even if the sample was not properly authenticated.

**Admission of Defendant's Statement to His Brother**

Defendant also argues that the district court erred by admitting into evidence a post-*Miranda* statement of Defendant to his brother. Defendant does not point to the portion of the record indicating that the statement was admitted. The State asserts that the statement was in fact never presented to the jury. This Court is under no obligation to search the record to find evidence to support an appellant's claims. *In re N.M. Indirect Purchasers Microsoft Corp.*, 2007-NMCA-007, ¶ 68, 140 N.M. 879, 149 P.3d 976. However, given defense counsel's representation that the statement was admitted in evidence and clear implication that it was presented to the jury, we reviewed the record. We found no such admission by the district court. We were

14

unable to find any indication in the record that the statement in issue was admitted in evidence for jury consideration. Defendant appears to have raised a false issue.

**Admission of Hearsay**

Defendant next argues that the district court erred in admitting the testimony of Officer Encinias that an EMT told him that Victim's pockets were turned inside out. Defendant argues that this statement was inadmissible hearsay. Once again, assuming arguendo that this evidence was erroneously admitted, we conclude that admission of the evidence was harmless error. There was no dispute that Victim's pockets were turned inside out. Defendant in fact took the stand and testified to this himself. According to Defendant, he asked Victim to turn his pockets inside out, which he did. We are unpersuaded that the officer's testimony about the EMT's statement prejudiced Defendant in any way. The admission of the testimony was harmless. *See Gonzales*, 2000-NMSC-028, ¶ 32.

**Confrontation Clause Error**

Defendant also argues that admission of the testimony about the EMT's statement violated his right to confrontation. He acknowledges that he did not raise this issue at trial, and he asks this Court to review for fundamental error. "To rise to the level of fundamental error, the error must go to the foundation or basis of a

defendant's rights or must go to the foundation of the case or take from the defendant a right which was essential to his defense and which no court could or ought to permit him to waive." *State v. Laney*, 2003-NMCA-144, ¶ 47, 134 N.M. 648, 81 P.3d 591 (internal quotation marks and citation omitted); *see State v. Baca*, 1997-NMSC-045, ¶ 41, 124 N.M. 55, 946 P.2d 1066 (stating that "[f]undamental error only applies in exceptional circumstances when guilt is so doubtful that it would shock the judicial conscience to allow the conviction to stand"). Defendant "must demonstrate the existence of circumstances that shock the conscience or implicate a fundamental unfairness within the system that would undermine judicial integrity if left unchecked." *Laney*, 2003-NMCA-144, ¶ 47 (internal quotation marks and citation omitted).

Defendant's entire five-page discussion on this issue consists of a recitation of Confrontation Clause evidentiary principles. However, Defendant has failed to show how the alleged error rose to the level of fundamental error through either circumstances that shock the conscience or that implicate a fundamental unfairness within the system, or that the court deprived him of a right which was essential to his defense. *See State v. Villa*, 2004-NMSC-031, ¶ 16, 136 N.M. 367, 98 P.3d 1017 (indicating that the party who raises the issue of fundamental error bears "the burden

of showing that some fundamental right has been invaded" (internal quotation marks and citation omitted)). We see no fundamental error.

Furthermore, to obtain a conviction of second degree murder, the State needed to show that Defendant killed Victim, that Defendant knew that his acts created a strong probability of death or great bodily harm to Victim, and that Defendant did not act as a result of sufficient provocation. UJI 14-210 NMRA. Defendant has not shown us how the testimony about the EMT's statement created "a reasonable possibility that the evidence complained of might have contributed to the conviction." *Gonzales*, 2000-NMSC-028, ¶ 32 (internal quotation marks and citation omitted). The admission was therefore harmless. *See id.* Had Defendant been convicted of robbery, the admission of the testimony about the EMT's statement would be at issue, but Defendant was acquitted of that charge.

**Failure to Grant Directed Verdict of Acquittal**

Defendant next argues, pursuant to *State v. Franklin*, 78 N.M. 127, 428 P.2d 982 (1967), and *State v. Boyer*, 103 N.M. 655, 712 P.2d 1 (Ct. App. 1985), that the district court erred when it failed to grant directed verdicts of acquittal on the charges of first degree murder, robbery, and conspiracy to commit robbery. As Defendant was acquitted of these charges, even if the court erred by not directing verdicts, any such

17

error was harmless as Defendant was not convicted of the crimes of which he complains and is not being punished for those crimes.

**Sufficiency of the Evidence**

Defendant next argues, also pursuant to *Franklin* and *Boyer*, that there was insufficient evidence to support the verdict of second degree murder. We disagree. We point Defendant to the standard of review which we apply when we review cases for the sufficiency of the evidence.

> We review the evidence in the light most favorable to the State, resolving all conflicts and indulging all permissible inferences to uphold a verdict of conviction. The test is not whether substantial evidence would support an acquittal, but whether substantial evidence supports the verdict actually rendered. In analyzing the evidence under that standard, we disregard conflicts in the evidence that would have supported a contrary verdict.

*State v. Neal*, 2008-NMCA-008, ¶ 19, 143 N.M. 341, 176 P.3d 330 (internal quotation marks and citation omitted). We hold that the evidence supports the conviction of second degree murder. Disregarding the contrary evidence that Victim had pre-existing injuries, the evidence was that Defendant punched and kicked Victim, that Victim was found unconscious and bloody with pools of blood on the floor, that Defendant left the area of Victim's apartment with a bloody shirt, and that Victim thereafter died. Even if we did consider the testimony about Victim's pre-existing

18

injuries, the testimony established that none of those injuries were either bleeding or even impairing his ability to work the day of the altercation.

We believe a reasonable jury could have concluded from this evidence that Defendant was guilty of second degree murder. As for self-defense, even though Defendant testified that Victim hit him first, there are two reasons for which we believe that a reasonable jury could have concluded that Defendant did not act in self-defense. First, the jury did not have to believe Defendant. *State v. Foxen*, 2001-NMCA-061, ¶ 17, 130 N.M. 670, 29 P.3d 1071. Second, even if the jury believed Defendant, a reasonable jury could have concluded that the elements of self-defense were not satisfied. *See* UJI 14-5183 NMRA (stating that the elements of self-defense are that the victim caused "an appearance of immediate danger of death or great bodily harm to the defendant," that "[t]he defendant was in fact put in fear of immediate death or great bodily harm" and struck the victim because of that fear, and that "[t]he apparent danger would have caused a reasonable person in the same circumstances to act as the defendant did"). While Defendant testified that Victim struck him, none of the officers testified that they saw any visible injuries on Defendant's face. Thus, a reasonable jury could have concluded that Victim did not create an appearance of immediate danger of death or great bodily harm to Defendant,

that Defendant did not actually fear as much, or that a reasonable person would not have reacted as Defendant did.

**Cumulative Error**

Finally, Defendant argues that cumulative error requires us to reverse under *State v. Martin*, 101 N.M. 595, 601, 686 P.2d 937, 943 (1984). *Id.* (stating that cumulative error "requires reversal of a defendant's conviction when the cumulative impact of errors which occurred at trial was so prejudicial that the defendant was deprived of a fair trial"). We disagree. We have concluded that none of the errors raised by Defendant prejudiced him or possibly affected the jury's verdict. As such, we conclude that the doctrine of cumulative error does not require reversal.

**CONCLUSION**

Victim's death was tragic, in large part because Defendant and Victim appear to have been friends and the death occurred due to a drunken altercation. Nonetheless, the jury found that Defendant was guilty of second degree murder. Defendant has not presented facts and argument sufficient to require us to disturb the jury's verdict and reverse his conviction. Therefore, we affirm.

**IT IS SO ORDERED.**

20

_____
**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____
**MICHAEL D. BUSTAMANTE, Judge**

_____
**CELIA FOY CASTILLO, Judge**